**BOTZ v. HELVERING, Commissioner of Internal Revenue, and six other cases.**

**Nos. 12342-12348.**

Circuit Court of Appeals, Eighth Circuit.

April 1, 1943.

Rehearing Denied April 26, 1943.

---

Malcolm I. Frank, of St. Louis, Mo. (William M. Fitch, of St. Louis, Mo., on the brief), for petitioners.

Warren F. Wattles, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen. on the brief), for respondent.

Before STONE, WOODROUGH and RIDDICK, Circuit Judges.

STONE, Circuit Judge.

These are separate reviews of determinations by the Board of Tax Appeals (now Tax Court) that each of the petitioners is liable, as transferee, for income and excess profits taxes of $12,886.19 and interest due from the Botz Printing & Stationery Company (a Missouri corporation) for the year 1933. Since the situation is the same as to all petitioners, the matters were consolidated before the Board and are here presented together.

There is no challenge of the liability of the company for the taxes. There is no dispute that the company was solvent in 1933 and well able to pay these taxes nor that it had distributed to petitioners and others like situated practically all of its assets by the end of 1936—the year when this tax deficiency of the corporation was determined by the Commissioner. The controversy is over the liability of the several petitioners to pay this tax as transferees of the assets of the company. The Commissioner contends—and the Board held—that the distribution to petitioners was to them as stockholders while petitioners contend it was to them as creditors under a certain contract of December 23, 1921, whereunder they purchased stock. Also, petitioners contend that their status as creditors has been established by judgments of a Missouri trial court and that such status so established must be accepted by the Commissioner in this proceeding.

## Fact Situation.

The facts involved in the above contentions are as follows: The Hugh Stephens Printing & Stationery Company was a Missouri corporation of which petitioner Otto C. Botz was president. Late in 1921, a merger of that company with others was contemplated whereby the entire assets of all were to be transferred to a new Missouri corporation, the Botz Printing & Stationery Company. To induce additional subscriptions to the stock of the new company, the Stephens Company made a written offer or statement that such stock would be sold "to employees" on certain terms, one of which was as follows: "It is further agreed, that in case of discharge or voluntary severance of connection by an employee-stockholder with the new corporation, that all stock or paid-up portion of stock, will be purchased back by The Hugh Stephens Printing & Stationery Company at its face value, plus interest at the rate of 7% for all the time between dividend dates, at the option of the employee, provided 30 days' notice of such desire is given, and it is agreed that money be paid back within 30 days of such time in cash."

The new company was incorporated January 3, 1922. Thereafter at various times, the petitioners and others bought stock therein under the terms of the above offer or statement. The main business of the new company was doing printing for and furnishing stationery to the State offices. A change in the politics of the State officials resulted in surrender of the contracts for this State business. As a consequence, the company, on Aug. 1, 1933, sold its

physical assets to the Midland Printing Company for $300,000, payable $75,000 cash and $225,000 in bonds of the purchaser. The assets not so sold consisted of accounts and notes receivable, a small amount of office furniture and the good will—these retained assets had little or no market value after the sale.

On or about the above sale date, these petitioners and others gave notice to redeem the above purchased stock in accordance with the above offer or statement. The Botz Company accepted these notices and proceeded to make payments thereon from the assets as and when realized. These payments extended through 1933 to 1936.[1] The shares thus involved were 3,664 out of a total issue of 4,516, leaving 852 shares (owned by four of petitioners) not thus disposed of and outstanding.

The company carried on no business after the sale. Its activities seem thereafter to have been confined to making some small collections on accounts receivable and in liquidation of its assets and making payment therefrom for these 3,664 shares of stock. There is a balance sheet, prepared from the books of the company by a rev-

---

[1] A list of such payments to petitioners and to "Other Stockholders" is, by years, as follows:

### 1933

| Review No. | Name | Amount in cash, bonds or stock in other corporations | Shares |
|---|---|---|---|
| 12,342 | Otto C. Botz | $ 5.400 | 54 |
| 12,343 | Renee O. Botz | 2,600 | 26 |
| 12,344 | Joseph C. Botz | 10,000 | 100 |
| 12,345 | Katherine Botz | 20,000 | 200 |
| 12,346 | Frank C. Botz | 10 000 | 100 |
| 12,347 | William B. Malone | 15,600 | 156 |
| 12,348 | Ada G. Malone | 25,000 | 250 |
|  | Other stockholders | 128,490 | 1,355 |
|  | Totals | $217,090 | 2,241 |

### 1934

| Review No. | Name | Amount in cash bonds or stock in other corporations | Shares |
|---|---|---|---|
| 12,342 | Otto C. Botz | $ 20,625 | 275 |
| 12,343 | Renee O. Botz | 36,000 | 450 |
| 12,344 | Joseph C. Botz | 13,500 | 150 |
| 12,346 | Frank C. Botz | 18,000 | 200 |
| 12,347 | Wm. B. Malone | 9,000 | 100 |
|  | Totals | $ 97,125 | 1,175 |

### 1935

| Review No. | Name | Amount in cash, bonds or stock in other corporations | Shares |
|---|---|---|---|
| 12,342 | Otto C. Botz |  |  |
| 12,343 | Renee O. Botz |  |  |
| 12,344 | Joseph C. Botz | $ 9,000 | 90 |
| 12,345 | Katherine Botz |  |  |
| 12,346 | Frank C. Botz | 5,800 | 58 |
| 12,347 | Wm. B. Malone |  |  |
| 12,348 | Ada G. Malone |  |  |
|  | Totals | $ 14,800 | 148 |

### 1936

| Review No. | Name | Amount in cash, bonds or stock in other corporations | Shares |
|---|---|---|---|
| 12,342 | Otto C. Botz | $ 6,500 | 100 |

enue agent, for the year ending December 31, 1933, as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $ 2,381.31 | Notes payable | $ 12,500.00 |
| Notes receivable | 9,501.13 | Accounts payable | 1,819.35 |
| Accounts Receivable | 37,955.56 | Vouchers payable | 2,915.61 |
| Bonds | 114,000.00 | Capital and surplus | 146,722.42 |
| Trust fund | 119.38 | | |
| Total | $163,957.38 | Total | $163,957.38 |

Also, there is evidence that there was a book value even at the end of 1936. However, the evidence is convincing that, except for a very small value in receivables and furniture, the sole value of the assets was in the above purchase price paid by the Midland Printing Company.

In January, 1936, notice of deficiency assessment for these taxes was given. The taxes were for gains realized by the above sale of physical assets to the Midland Printing Company.

### 1. The Creditor Issue.

The position of petitioners as to this issue is that the proposition to repurchase became a contract creating the position of debtor-creditor; that there was a valid consideration given by petitioners; that a corporation has a legal right to discharge such a contract obligation; that the payments here did not render the corporation insolvent; and that the obligee does not become liable, as a transferee, for the unpaid income tax of the corporation.

It is true that the proposal in the statement by the Stephens Company [2] and the subsequent subscriptions for stock in reliance thereon constitute a contract based upon a consideration passing from such subscribers. Likewise, it is true that, ordinarily, a corporation may discharge a contract obligation by payments and that such payees do not thereby become liable for federal income taxes of the corporation as transferees. Also, the above is true even if the obligee creditor to whom such payments are made be also a stockholder in the corporation. However, these general legal truths do not solve the problem here.

We have here a particular kind of con-tract. If the contract is sufficient to establish a debtor-creditor relation between petitioners and the company, yet the subject matter of the contract is the repurchase of their stock by the corporation. The purposed and the effectual result of performance of the contract would be to take assets from the corporation in exchange for nothing of any value to its creditors. Such a situation brings into play established rules of law concerning the nature and functions of capital stock in corporations and the usually stringent rules against withdrawal thereof.

Thus because of the particular subject matter of this contract we have considerations of public policy which bear directly upon the application of the contentions of the petitioners. Our problem is how far these considerations control the situation here.

In the statutory method of collecting income taxes is provided the liability of transferees of the taxpayer. That liability is "the liability, at law or in equity, of a transferee of property of a taxpayer" Int.Rev.Code, § 311(a) (1), 26 U.S.C.A. Int.Rev.Code § 311(a) (1). Whether a transferee is liable "at law or in equity" depends upon State law. Helvering v. Stuart, Nov. 16, 1942, 317 U.S. 154, 63 S. Ct. 140, 87 L.Ed. ——; Blair v. Commissioner, 300 U.S. 5, 9, 57 S.Ct. 330, 81 L.Ed. 465; Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634. Here, it is the law of Missouri as to stockholders who are transferees of the property of the corporation. One of the statutory powers of Missouri corporations is: "To purchase, hold, sell and transfer shares of its own capital stock: Provided, that no such corporation shall use its funds or property for the purchase of its own shares of stock when

---

[2] There was no offer by the Botz company but respondent makes no point upon this and treats the proposal of the Stephens company as binding upon the Botz company. Without determining this matter, we accept the situation as both parties have treated it and will regard the matter as though the Botz company has made the proposal.

such use would cause an impairment of the capital of the corporation or perpertrate a fraud upon its creditors or other stockholders." R.S.Mo.1929, § 4940, same R.S. Mo.1939, § 5345, Mo.R.S.A. § 5345. Other sections, R.S.Mo.1929, §§ 4948–4950, same R.S.Mo.1939, §§ 5353–5355, Mo.R.S.A. §§ 5353–5355, prescribe the conditions and methods of diminishing capital stock.

Missouri decisions hold that the only way by which capital stock can be diminished is as required by the above sections, and that a contract by a corporation to repurchase its stock is ultra vires and void as against public policy. David v. B. L. Fry Mfg. Co., 209 Mo.App. 134, 236 S.W. 1103; Hunter v. Garanflo, 246 Mo. 131, 151 S.W. 741; Wilson v. Torchon Lace & Mercantile Co., 167 Mo.App. 305, 149 S.W. 1156; and see Potts-Turnbull Adv. Co. v. Gatchell, Mo.Sup., 257 S.W. 134, 139; and Stringfellow v. Rosebrough Monument Co., Mo.App., 196 S.W. 1050, 1052, 1053. In Hunter v. Garanflo, supra, 151 S.W. at page 742, the court stated: "The withdrawal of this fund, or any part of it, by the stockholders, otherwise than under the sanction of the law in conformity with which it is created, or its application to other uses than those authorized by the laws under which the corporation exists, is a clear violation of the policy of the state as expressed in its Constitution."

In St. Louis Carriage Mfg. Co. v. Hilbert, 24 Mo.App. 338, 343, in reference to the power of a Missouri corporation to purchase its own stock, the court said: "A corporation in this state has no such power. It is not simply a question between the state and the corporation, or between the corporation and its creditors, as the defendant assumes, but a question affecting the validity of the contract itself."

█ Since the contract here was void as against public policy, no legal relation of debtor-creditor can be based thereon. As the petitioners received these payments under a void contract and in violation of the public policy of the State of incorporation, creditors of the corporation could follow such funds into their hands. The payments were, in law, a fraud upon such creditors.

█ The question of whether or when such payments rendered this corporation insolvent is not material. If it were, it could not avail petitioners under the facts. Upon substantial evidence, the Board found that "shortly after said sale was consummated, all of the stockholders, including petitioners, requested the corporation to repurchase their shares of stock at $100 per share as provided in said repurchase agreement." Further, the Board found that the corporation then agreed to repurchase said shares of stock at par and did make the payments herein involved. This situation is clearly set forth in the evidence of the president of the company who testified: "All of the stock was bought back in 1933, but bought back conditionally, if, when and as we should have sufficient funds to pay for it. The demand was made in 1933, so we agreed at the time to repurchase all the outstanding stock under the contract we made in selling it, when, as and if we got the money to pay for it. Stock was paid for under this repurchase agreement along through 1933, 1934 and 1935 and until 1936, when I turned in 100 shares and took $6,500.00." Thus the situation is revealed as being a series of intimately connected transactions which justified the conclusion of the Board that: "It may be true that these distributions in the earlier years did not bring about insolvency of the Botz Co., but the important and controlling fact is that the distributions were each made as one of a series of distributions in partial liquidation, which unquestionably rendered the corporation insolvent. The petitioners, distributees, are therefore liable as transferees in the respective amounts of those distributions they received."

## 2. State Judgments.

This issue is the contention of petitioners that the Board was bound (under the full faith and credit provisions of the Constitution, Sec. 1 Art. 4) to accept the determination of a State trial court that they were creditors as to these payments. The situation is as follows: The last payments made to petitioners were in 1936 and left the company with assets which were then known to have no value. As to each of the petitioners, the payments did not equal the amounts which would have been due under the repurchase arrangement. Thus a balance was due each under such arrangement. In January, 1936, the deficiency letter was sent the company. An appeal to the Board was filed by the company. In October, 1938, a stipulation of deficiency was filed and the Board entered its order in accordance therewith. No appeal was taken and in November, 1938, the taxes

were duly assessed with interest to that date. Notice and demand issued but no assets were found upon which to levy. In October, 1939, the company, by petitioner Otto C. Botz (its president), made an offer in compromise, alleging the company was "defunct, insolvent, and unable to meet this obligation." In November, 1939, deficiency notices were issued to the petitioners. These notices charged petitioners "as transferee of assets" of the company—the "Statement" accompanying each notice specified the transferred assets to have been in the years the petitioner received the payment involved here. In February, 1940, each petitioner filed a petition for redetermination with the Board wherein the status of transferee was denied. The answers of the Commissioner and the replies of petitioners clearly raised the issue of the character of these payments claimed, by the Commissioner, to constitute the petitioners as transferees. Both were filed April 3, 1940. At this last date and before, petitioners knew the insolvent situation of the company and that the issue upon which their several liabilities as transferees depended was whether or not they had received these payments as creditors of the company. The hearing for the Board was before a member on April 5, 1941.

Almost a year after the issues before the Board had been made up and only ten days before the hearing before the Board member, each of the petitioners (on March 27, 1941) filed a petition in the State trial court. Petitioners Otto C. and Frank C. Botz sought recovery of the balance (over the payments) under the alleged contract of repurchase—in a second count, recovery was sought for advances to the company and salaries (both subsequent to 1933). Renee O. Botz, Joseph C. Botz and William B. Malone sought the balance (over payments) under the alleged contract of repurchase. Katherine Botz and Ada G. Malone pleaded full payment on their stock but sought recovery of a dividend of 7% thereon from January 1, 1933 to September 1, 1933 (date of payment for their stock.)[3] Answers were filed, on the same day as the petitions, wherein the company admitted "that there is a balance due plaintiff in the sum of [the amount sought in count one of each petition] under said contract, together with interest thereon at the rate of 6% per annum from the 1st day of August, 1933" —the prayer of the answer was for "judgment in its behalf and for its costs." The following day (March 28, 1941), the court entered judgment for such balance with interest from August 1, 1933. The respondent had no notice of these proceedings and, apparently, no knowledge of them until they were offered in evidence. The Board found these proceedings to be clearly collusive and not binding upon it. That this finding as to the collusive character of these proceedings is justified by the evidence is certain. The question remains as to whether such collusive judgments are binding upon the Board under Section 1, Article IV of the Constitution.

█ This section of the Constitution requires that "Full Faith and Credit shall be given in each State to the * * * Judicial Proceedings of every other State." This provision is applicable to proceedings in federal courts. 28 U.S.C.A. § 687; Davis v. Davis, 305 U.S. 32, 40, 59 S.Ct. 3, 83 L.Ed. 26, 118 A.L.R. 1518; Cooper v. Newell, 173 U.S. 555, 567, 19 S.Ct. 506, 43 L.Ed. 808; Mueller v. Mueller, 8 Cir., 124 F.2d 544, 548. Section 1 of Art. 4 of the Constitution prescribes that "the Congress may by general Laws prescribe * * * the Effect thereof." Section 687, 28 U.S.C.A., provides that "the said * * * judicial proceedings * * * shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken." Therefore, our inquiry is as to what effect would be accorded to these judgments in Missouri courts. Badger Dome Oil Co. v. Hallam, 8 Cir., 99 F.2d 293, 296; In re Cherokee Public Service Co. (Dickinson v. Orr), 8 Cir., 94 F.2d 536, 538. The law of Missouri is as follows:

█ First. One not a party to an action nor in privity is not bound by a judgment or decree (City of Springfield v. Ransdell, 305 Mo. 43, 264 S.W. 771, 773), and a judgment between a debtor and one creditor is not binding on another creditor (even for the same matter) who was not a party. Gillilan v. Schmidt, 131 Mo.App. 666, 111 S.W. 611, 612. Nor is a judgment against a garnishee by one creditor binding upon another creditor against the same garnishee. Strauss v. Ayres (Kinney), 87

---

[3] Another provision in the Stephens Company letter of December 23, 1921, guaranteed dividends of "at least 8%."

Mo. 348, 350. Respondent was not a party to these suits in the State court and was not in privity with any of the parties to those suits. The situation here is stronger than that ruled in the Gillilan and Strauss cases.

■■■■■ Full faith and credit does not require recognition of a judgment if the party against whom the judgment is thus urged was not a party or privy or appeared in the judgment suit. In Bagley v. General Fire Extinguisher Co., 212 U.S. 477, 480, 29 S.Ct. 341, 343, 53 L.Ed. 605, the Supreme Court stated: "The defendant was no party to that judgment, and there is nothing in the Constitution to give it any force as against strangers." This is so because "This requirement of full faith and credit is to be read and interpreted in the light of well-established principles of justice, protected by other constitutional provisions which it was never intended to modify or override"—such as due process. Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 134, 137-142, 32 S.Ct. 641, 645, 56 L.Ed. 1009, Ann. Cas.1913E, 875.

■■■■■ Second. A consent judgment is binding only upon those parties consenting thereto. Robinson v. Seay, 175 Mo.App. 713, 158 S.W. 409, 412. There was no consent here or even knowledge.

■■■■■ Third. Where the method of procurement of a judgment against a corporation by an officer and creditor of the corporation worked a fraud in law upon other creditors it may be collaterally attacked. Broussard v. Mason, 187 Mo.App. 281, 173 S.W. 698, 703. Also see Emerson-Brantingham Implement Co. v. Montgomery, 222 Mo.App. 12, 300 S.W. 538; Howey v. Howey, Mo.Sup., 240 S.W. 450; Lieber v. Lieber, 239 Mo. 1, 143 S.W. 458; and Consolidated Iron & Steel Co. v. Maumee Iron & Steel Co., 8 Cir., 284 F. 550, 553, 554. Obviously, these consent judgments were frauds in law—if not in fact—upon all other creditors of the Botz Company. If stockholders of a corporation can, through contracts void as against the law of the incorporating Estate, establish a creditor status, in direct violation of that law, through the easy device of judgments consented to by the corporation which they control, thus enabling them to abstract the assets (including capital stock) of the corporation, then a new high has been reached in defrauding innocent creditors. As said

in Warrington v. Ball, 3 Cir., 90 F. 464, 466: "To bind one by a judgment to which he is not a party, as provided for by the statute [of Kansas], is barely tolerable. To bind him by such a judgment obtained by fraudulent collusion * * * would be intolerable." While there is no direct decision cited to us, yet there are strong intimations—and in tax cases involving State decisions—that collusive State judgments will not be allowed to defeat National tax laws. Blair v. Commissioner, 300 U.S. 5, 10, 57 S.Ct. 330, 81 L.Ed. 465; and Freuler v. Helvering, 291 U.S. 35, 45, 54 S.Ct. 308, 78 L.Ed. 634.

For any or all of the above reasons, the Board was correct in denying any effect to these judgments. The decision of the Board is, in all respects, affirmed.