Mignon **REINECKE**, Transferee,
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 15049.

United States Court of Appeals,
Eighth Circuit.

March 24, 1955.

Henry C. Lowenhaupt, St. Louis, Mo. (William R. MacGreevy and Lowenhaupt, Mattingly, Chasnoff & Stolar, St. Louis, Mo., on the brief), for petitioner.

Karl Schmeidler, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Hilbert P. Zarky and Louise Foster, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

Carl J. Reinecke owed income-tax deficiencies for the years 1945, 1946 and 1947, amounting to $10,177.74. In January, 1948, he married the petitioner here, Mignon Reinecke. Thereafter, he transferred or assigned to her an insurance annuity contract, issued to him by Phoenix Mutual Life Insurance Co., dated March 25, 1937, and having at the time of the assignment or transfer a cash surrender value exceeding the amount of his income-tax deficiencies.

The insurance annuity contract, which provided for an annual premium payment of $1,220.64, had an endowment maturity date in Reinecke's favor of March 25, 1952, entitling him or his assignee to receive at that time, upon surrender of the policy, the sum of $20,480 in cash, or to be paid the amount of $160 a month thereafter during the remainder of Reinecke's life.

Petitioner had been constituted as the insurance beneficiary of the contract ever since March 22, 1946, under designation made by Reinecke, first under her then name of Mignon Estes, and following her marriage as Mignon Reinecke.

After unsuccessful and sufficient efforts to collect the income-tax deficiencies from Reinecke, the Commissioner of Internal Revenue undertook to impose a liability upon Mrs. Reinecke as a transferee, 26 U.S.C.A. Internal Revenue Code § 311(a) (1), in relation to the assigned insurance annuity contract. She sought decisional relief from the Tax Court, which upheld the Commissioner's right to collect the amount of Reinecke's deficiencies against her, and she thereupon filed a petition here for review.

The insurance annuity contract had been kept in force until its endowment maturity date was reached, in March, 1952, after which petitioner, under distraint of the Collector, made surrender of it to the Company for payment of its $20,480 endowment value, with the amount of the income-tax deficiencies and interest being taken possession of by the Collector from the proceeds. This occurred during the pendency of the case in the Tax Court.

Among the findings made by the Tax Court, in holding against petitioner, were that the assignment of the contract to petitioner had occurred "sometime in May or June, 1950;" that Reinecke was at that time insolvent; that the assignment was without consideration; that it was made with the object on Reinecke's part of hindering, delaying and defeating the Government's collection of the income-tax deficiencies involved; and that this also had been its actual effect. On the basis of Reinecke having so made transfer of his cash

surrender right in the insurance annuity contract, with its possession of a value sufficient to satisfy his income-tax deficiencies, the Tax Court held that petitioner could be required to respond for the tax liability as the recipient of a legally fraudulent conveyance or transfer.

Petitioner contends that the Tax Court erred in not finding, instead, that transfer of the insurance annuity contract was in fact made to her in April, 1948—three months after the marriage—by a physical delivery of the instrument to her at that time, with the object of vesting title in her, and with the incidents of complete possession and dominion having also been given and thereafter held and exercised by her on the basis of such actual ownership; that the assignment executed in her favor some.two years later (which the Tax Court held to be the sole source and extent of her rights) was intended as and represented a formal confirmation or perfection merely of the previous ownership-transfer; that the transfer which had been thus allegedly made in April, 1948, was in performance of a parol antenuptial agreement entered into between her and Reinecke, whereby he had bound himself to transfer title to the contract to her in consideration of her promise to marry him; that the transfer and assignment to her thus had had a valuable and sufficient consideration; that Reinecke was not shown to have been insolvent at the time of such transfer; and that on these circumstances there could exist no basis on which to claim a fraudulent conveyance or transfer or to impose any liability upon her in relation to her receiving of the property.

Petitioner had offered testimony on the part of herself and her daughter and son-in-law, supportive in its general aspects of the fact of the insurance annuity contract having purportedly been turned over to her by Reinecke, at the time, in the manner, and under the circumstances claimed by her. But other substantial probative elements were produced by the Government, which were incapable of being reconciled with petitioner's version of the factual situation, and which left the Tax Court free, on a sufficient basis, to test, balance, choose and resolve as to what the realities had been.

Thus, the Tax Court could not be said to have been required to accept petitioner's claim as to the contract having been turned over to her in April, 1948, and as to her having had the possession and dominion of the instrument from that time on as owner, against the Government's proof from the records of the First National Bank in St. Louis of the facts that the contract had been assigned by Reinecke to the Bank in 1946 as part of the collateral for a loan made to him; that the loan had not been paid off until May 4, 1950; that the contract appeared upon the Bank's Collateral Register as having been throughout all that time under assignment to and in the possession of the Bank as pledgee; and that on May 4, 1950, at the time the loan was paid off, Reinecke himself had made confirmation of these facts by receipting the Register for the policy, with specific identification of it, as being on that date returned to him.

The Government further showed that, on the very day of the Bank's return of the policy to Reinecke, a purported but defective assignment of the contract, with notarial certificate of acknowledgment on the part of Reinecke, had been made in favor of petitioner. Another assignment, in due form and with proper acknowledgment, was thereafter executed by Reinecke in petitioner's favor on June 9, 1950. It was these assignments which the Tax Court held had been the first and only legal basis of petitioner's rights in the contract, and which, on the time and circumstances involved in what Reinecke thus did, had made the transfer a vulnerable one in petitioner's hands as against the Government's unsatisfied tax claim, and so legally had given rise to a liability as transferee against her.

On these direct, substantial, probative elements of material conflict with petitioner's testimony, as we have suggest-

ed, we would not be entitled to say as a matter of law that the Tax Court was required to find that the fact was that the contract had been transferred to petitioner, by a physical delivery in April, 1948, and with the possession and dominion having from that time on been held by her in confirmation and demonstration of such an ownership-change having occurred. And with the Tax Court being persuaded and finding to the contrary—that the alleged 1948 transfer by delivery, possession and dominion had not been credibly established as having existed—the court further rationally could conclude that the 1950 assignment had in fact constituted the sole source and basis of petitioner's rights in the contract.

Having rejected petitioner's version of the time and manner of ownership change, the Tax Court could, with these non-existent, material elements being relied upon by her as a basis of foundation and correlationship for her alleged rights, also rationally regard the 1950 assignment as not having had any relationship to an antenuptial agreement and not having rested upon any prior considerational promise to assign, in the light of the factors (1) of the remoteness of the date of the assignment to the time of the marriage; (2) of Reinecke's execution of the assignment only after he had become insolvent; (3) of the immediacy of the execution of the assignment to the efforts which the Government had for some time been making to collect the tax deficiencies against him; (4) of his apparent concern to get the policy assigned and out of his hands on the very day that it was returned to him by the Bank; and (5) of the other conduct which the Tax Court found that he had similarly been engaging in to escape the payment of his income taxes.

In connection with all this, it incidentally also may be noted that Reinecke obviously was not desirous of giving any testimony on any aspect of petitioner's contentions, nor did petitioner attempt to have him make confirmation thereof in any way, for he was merely put upon the stand at the trial, requested to give his name and address, and was then excused, without any other inquiry being undertaken to be made of him.

Following the decision of the Tax Court against her, petitioner filed a motion for rehearing on the ground of newly discovered evidence. The alleged new evidence consisted of an instrument, captioned "Trustee's Receipt for Securities"; representing a purported business form of the First National Bank in St. Louis; having the blank spaces filled in, with the date set out of April 14, 1948, and with a purported recitation therein that Reinecke was being allowed to take out the insurance annuity contract as "Agent" of the Bank, "for the purpose of changing beneficiary arrangement and for that purpose only;" and providing that the Bank was retaining "all its rights as custodian or pledgee of said securities." A signature had ostensibly been placed upon the instrument at one time but had been cancelled or annulled by being covered with heavy lines of mutilation drawn over and through it. There was no competent showing in the motion that the nullified signature ever had been intended to have any operative effect or that the instrument itself ever had been used or accorded a significance for any purpose.

Petitioner contends that the instrument should be regarded on its face as having had relationship to the change in the name of the beneficiary from Mignon Estes to Mignon Reinecke, made in the annuity contract in April, 1948. But its date was subsequent to that borne by the written request made by Reinecke upon the Insurance Company for the change in petitioner's name as beneficiary, and subsequent also to that reflected by the printed record of the Company's receiving and actual recording at its home office in Hartford, Connecticut, of the change to petitioner's married name. It would not be entitled to be declared that the Tax Court was required to accept this naked, equivocal instrument, with its unexplained, cancelled signature, with its date subsequent to

the time that the Company had received and recorded the requested change in beneficiary name, and with its lack of any legal showing that the instrument ever had had operativeness or significance of any nature, as demonstrative, for new trial purposes, that Reinecke had been given possession of the policy in April, 1948, and had turned it over to petitioner in ownership and retained possession at that time. Against any such probative implication being thus impelled, stood the Bank's records and the plain and unimpeached receipt by Reinecke for the Bank's having turned over the possession of the policy to him on May 4, 1950, with the confirmation given to the occurring of such possession in him by his attempt on the very same day to make assignment of the policy to petitioner. In the light of Reinecke's then insolvent condition, and of his previous efforts to frustrate the collection of his taxes, it would not be an irrational inference for the Tax Court to conclude that this coincidence in the date of his obtaining possession of the policy and his executing an assignment of it was not fortuitous but meaningful in the chain of circumstances involved.

It may be observed also that even petitioner's own testimony had made no express attempt to link the alleged turning over of the policy to her in April, 1948, with the changing of her name as beneficiary from Mignon Estes to Mignon Reinecke. The record is devoid of any direct testimony by her or any one else in respect to how or when this change in her beneficiary name was effected. All that appears is the recording of the change and its date on the part of the insurer. In the absence of any direct explanation in the evidence, we do not think that the Tax Court was required to try to resolve at all the collateral fact of how the change had been effected, for the purpose merely of such incidence, if any, as it might have, in possible corroboration or confirmation, one way or the other, on the ultimate questions involved—by undertaking to speculate on whether the Insurance Co., since merely

the name and not the person of the beneficiary was being changed, had perhaps accepted the change and issued an endorsement for attachment to the insurance annuity contract, without having the instrument itself sent in; or whether, if the policy might have been sent in to have the endorsement made, this had perhaps been done by the First National Bank in St. Louis itself as an accommodation to Reinecke, upon his request to be permitted to have the correction or change in name made to appear; or whether the cancelled and nullified trust-receipt form might possibly be accepted as indicating that Reinecke had perhaps been allowed by the Bank to have temporary possession of the policy for this special purpose, as "Agent" for the Bank and subject to the Bank's retention of "all its rights as * * * pledgee."

In any event, even if the Tax Court had undertaken to resolve the collateral question of how the change in petitioner's name as beneficiary had been effected and had accepted the third hypothesis set out above as possibly having constituted the basis thereof, this could not here legally be said to be capable of probatively tipping the scales in petitioner's favor upon her contention of ownership transfer having occurred, involving the material elements of alleged possession and dominion of the contract by her, when considered against the direct, unassailed, unmotivated, competently-adduced documentary proof of the Bank's existing assignment and of its possession of the contract thereunder, with return of the policy being demonstrated to have been made to Reinecke on May 4, 1950, by his signed acknowledgment and receipt therefor and with rational corroboration being added thereto by his admitted attempt on the same day to effect a formal assignment of the contract to petitioner. We think the Tax Court could properly say, as it did in denying petitioner's motion for rehearing, that the alleged new evidence was not such, even if it had been accompanied by competent foundational and explanatory

showing, as could and might produce a change in the decisional result, and so to entitle petitioner to another trial, on the question of whether she in fact became the owner of the contract in 1950 or in 1948.

We hold that there was ample and proper basis for the Tax Court to find that legal transfer or assignment of the contract to petitioner was first made in May or June, 1950; that such transfer was without consideration; that there was, on the testimony adduced and the circumstances shown, "no credible or convincing evidence of any prior promise to assign the annuity contract to petitioner;" that at the time the transfer to petitioner was made Reinecke was insolvent; and that Reinecke's object in making the assignment and the result of what he so did had been to hinder, delay and defraud the Government's collection of his income-tax deficiencies.

█ Petitioner has made the further contention, however, that, even though the Tax Court's findings as to the facts of ownership and transfer be thus upheld, there still should be held to be no basis legally for any liability to have existed against her as a transferee, from the assignment to her and receipt of the insurance annuity contract in ownership by her in 1950, because of the affecting provisions of Mo.Rev.St.1949 § 377.330, V.A.M.S. § 377.330.

That section provides: "The money or other benefit, charity, relief or aid to be paid, provided or rendered by any corporation authorized to do business under sections 377.200 to 377.460 [the writing of stipulated-premium-plan or reserve-basis life insurance, having generally a cash surrender value], shall not be liable to attachment or other process, and shall not be seized, taken, appropriated or applied by any legal or equitable process, nor by operation of law, to pay any debt or liability of a policy or certificate holder, or of any beneficiary named in a policy or certificate."

This statute, as we read its language and the expressions of the Missouri courts relating to it, simply creates a protective immunity, from seizure by attachment or appropriation through other legal or equitable process, for whatever benefits may be provided for by such a policy in favor of the holder or the beneficiary thereof, as against the claims of any creditor of either, so long as such benefits constitute merely something *"to be paid,"* or in other words represent only a matter of *unripened* or *unmatured* or *unfixed policy obligation,* under the terms of the contract. Stated differently—its object would appear to be primarily to deprive creditors, as a matter of state policy and interest in preserving life insurance in force in the State, of the power to destroy the existence or effect the cancellation of any "old line" or reserve-plan life insurance policies, through attempts to reach the premiums paid, the cash surrender value thereof, or such other benefits as have been provided for therein, so long as the obligation of the insurer to pay these benefits—whatever their nature may be—has not ripened or matured or become fixed in accordance with the terms of the contract.

Thus, in Kansas City v. Halvorson, 352 Mo. 1027, 180 S.W.2d 710, 711–712, where a judgment creditor was attempting to reach the life insurance policies of an insolvent debtor, H. H. Halvorson, carried by him in the amount of approximately $40,000, with a premium payment being made thereon of over $1500 annually, and having his wife named in all of them as beneficiary, the Missouri Supreme Court, in an en banc opinion, emphasized the significance of the language, "to be paid," in § 377.330, and said: "Applying this section to the facts stated in appellant's petition, it says that any money to be paid by the corporate respondents (the insurance companies) cannot be seized, either legally or equitably to pay H. H. Halvorson's debts while these policies are in effect; that is, before H. H. Halvorson's death."

The Court further pointed out the necessity, where the wife is the beneficiary, of reading § 377.330 in relation-

ship to § 376.560 of the statute, which provides: "Any policy of insurance heretofore or hereafter made by any insurance company on the life of any person, expressed to be for the benefit of the wife of the insured, shall inure to her separate benefit, independently of the creditors, executors and administrators of the husband; provided, however, that in the event of the death or divorcement of the wife before the decease of the husband, he shall have the right to designate another beneficiary, upon written notice to the company * * *. But when the premiums paid in any year out of the funds or property of the husband shall exceed the sum of five hundred dollars, such exemptions from such claims shall not apply to so much of said premiums so paid as shall be in excess of five hundred dollars, but such excess shall inure to the benefit of his creditors."

On the basis of the two sections being so read in relationship, the Court added this expression in its opinion: "Section (376.560) cannot be an exception to Section (377.330), supra. In the first place, Section (376.560) applies to all kinds of life insurance policies and that section was originally enacted in the year 1865; while Section (377.330) was first enacted in 1899 and applies only to insurance policies on the stipulated premium plan, where a reserve is established, so it can have a cash or surrender value. Section (376.560) may apply to a policy that does not have any reserve. This shows that Section (376.560) contemplates that the death of the policyholder must occur before the creditors can come within its provision. * * * Can it be said that H. H. Halvorson could [while insolvent] have a policy of insurance in which his sister is the beneficiary and she would be protected under Section (377.330), yet his wife would not have that protection because of Section (376.-560)? We think not." 180 S.W.2d at page 712.

From these (the most recent) declarations of the Missouri Supreme Court, we take the situation under the statutes of that State to be that—no matter how much old-line or reserve-plan life insurance an insolvent debtor may be carrying; no matter who the designated beneficiaries thereof may be; no matter what amount of premiums is being paid thereon; and no matter how large an accumulative surrender value the policies may have—the benefits of whatever nature which can be made to or will become payable thereunder are immune from the reach of any creditors, either of the holder or the beneficiaries, until the obligation of the insurer to make payment of such benefits has ripened, or matured, or become fixed, in accordance with the terms of the policy.

In the ordinary policy situation, generally "the death of the policyholder must occur", as the Court said in the Halvorson case, supra, before the door is open to a creditor to reach out in any way to touch the payment benefits of a life insurance policy or any other pecuniary aspect in relation to it, such as the excess of premiums which have been paid over $500 in any year on any insurance of which the wife constitutes the beneficiary.

As a matter of fact, all that it is in any event possible for a creditor to touch, in relation to such policies in Missouri as the wife constitutes the beneficiary of, where she has so been from the issuance of the policies to the insured's death, is the amount of "premiums * * * paid * * * in excess of five hundred dollars" in any year. § 376.560, supra.

But where the wife does not constitute the original beneficiary and is designated as beneficiary only after the policy has acquired a cash surrender value, the cash surrender value possessed by the policy at the time of such designation will, upon the insured's death, be treated under the Missouri statutes as having been in the nature of and amounting to premium paid for the benefit of the wife in the year that she was designated as beneficiary, and thus its amount will be made subject to the provisions of § 376.560, provided it is shown

that the insured then was and had continued to remain insolvent. Judson v. Walker, 155 Mo. 166, 55 S.W. 1083.

This practical viewpoint and construction of the statute have been adopted because, as expressed by the Supreme Court of Missouri, the premiums paid in carrying such insurance, up to the time that the wife is made beneficiary, have had no relationship to the protection of the insurable interest possessed by her in her husband's life, and the accumulated cash surrender value derived from such payments, and carried into her beneficiaryship, is therefore entitled to be treated in realistic effect as "if, instead of changing the beneficiaries in the policies, (the insured) had surrendered them, and taken their values in cash, and had afterwards applied for new policies * * * on the same plans," as to which "his increased age would have increased the cost, even if nothing else intervened." Id., 55 S.W. at pages 1088 and 1089.

As to any regular premiums paid by a husband while his wife is beneficiary, the question of whether an intent to defraud creditors has existed is utterly immaterial under the Missouri statute. " 'What he expended in premium to the amount of $500, whatever his intentions, could not affect creditors, since that which the law authorized him to do could not be fraudulent; and the premium in excess of $500 would be liable to plaintiff's claims without regard to his intention.' " Kiely v. Hickcox, 70 Mo.App. 617, 622–623, quoted with approval in Kansas City v. Halvorson, supra, 180 S.W.2d at page 711.

As has been suggested above, in the usual policy situation, the insurer's promise or obligation as to the benefits provided by a policy will not ordinarily be called into play, so as to mature or cause it to become fixed, until the death of the insured occurs. But this is not always or in all aspects the legal fact. Some times the insurer's obligation for benefits will be caused otherwise to mature or become fixed.

Thus, if the insured undertakes, while living, to surrender his policy and calls upon the insurer to pay him its existing cash value, thereby causing the insurance relationship to be terminated, the obligation of the insurer to make payment of that contractual benefit as provided in the policy will legally have become as fully matured and fixed as the insurer's obligation to pay the death benefit under a policy becomes from the death of an insured whose policy has been kept in force.

Or where, as in the present situation, the policy is one of a special nature, with provision for an automatic endowment maturity date, and with the insurance features of the contract terminating at that time, the obligation of the insurer then to make payment of the endowment value in accordance with the terms of contract will equally have become as matured and fixed as in the case of a ripened death-benefit obligation.

■ What has been said is, we think, sufficient to demonstrate that there is no merit in petitioner's contention that the Missouri statutes left her without any basis of liability whatsoever, under state law, to the Government for the amount of Reinecke's taxes, in relation to the assignment made to her of the insurance annuity contract. The contract, as has been pointed out, had at the time of the assignment to her a cash surrender value exceeding the amount of the tax deficiences. Only two more premium payments remained to be made upon it, until the contract reached its maturity date and its endowment value would become automatically matured or fixed— which premiums, as the Tax Court incidentally found, were as a matter of fact made with funds of Reinecke and not of petitioner. The assignment was without consideration, and Reinecke was, both then and until the contract matured, insolvent. On the basis of these facts, the proceeds of the matured endowment value and obligation, as existing under the contract, clearly were liable under Missouri law for the amount of Reinecke's unpaid tax deficiencies, since to that extent at least there had been an excess of premiums paid by him for

petitioner's benefit over those permitted by the statute, even looking at the 1948 or the 1950 cash surrender value alone. Judson v. Walker, supra, 155 Mo. 166, 55 S.W. 1083.

Petitioner has made the contention that her surrender of the contract to the insurer was prompted only by the distraint engaged in by the Collector in relation to it. That fact is, however, without legal significance in the situation. So far as is in any way presently material, the policy obligation of the insurer for payment of the endowment benefits had legally become mature or fixed when petitioner made the surrender. We do not understand the Missouri statutes to mean that a policyholder or beneficiary can thwart such rights as creditors otherwise properly may have to obtain satisfaction out of the matured benefits of a policy by a sitting back and refusing to send in a terminated policy in order to escape having the proceeds so used. We regard the expressions of the Missouri Supreme Court in the cases cited as manifestly implying that the absolute immunity from process which is accorded by § 377.330 to unmatured life insurance policies is without application to matured policies—in other words, those where the obligation of the insurer for payment of benefits has legally ripened or become fixed in accordance with the terms of the contract.

Since the decision of the Tax Court in the present situation can properly be affirmed on the basis of the liability existing and enforceable against petitioner under Missouri law, to allow payment of Reinecke's tax deficiencies to be made out of the matured endowment proceeds, there is no need for us to consider the question here of whether a liability as transferee, under 26 U.S.C.A. Internal Revenue Code § 311(a) (1), is capable of existing beyond the substantive concepts and bounds of state law, with the limitations imposed constituting more than a state procedural barrier.

In Missouri, as we have indicated, the limitations of the statute in respect to the reaching of unmatured life-insurance benefits, would appear to rest upon a state policy of attempting to preserve life insurance in force in the State as a matter of public interest and general welfare. Certainly, it does not rationally impress that what the Legislature of Missouri was concerned about and was trying to prevent was simply the institution of garnishment proceedings or suits against life insurance companies. Without the statute, creditors would have had the power to destroy the existence of such insurance, where a policy having a cash surrender value was assigned by an insolvent insured without consideration, for, as said by the Court in Judson v. Walker, supra, 55 S.W. at page 1086, "There is no dispute of the general proposition that a voluntary conveyance by an insolvent debtor of his property to or for the benefit of his wife and children is deemed fraudulent as to his creditors, and void, in law; and that an assignment under such conditions of a life insurance policy [absent the statute] would have a like effect is also undisputed." See also generally V.A.M.S. § 428.020.

Whether, for federal income-tax collection purposes, "the existence and extent of a transferee's liability is to be determined by local law" or is entitled to be rested "on general law as declared by federal courts" is a question on which the Courts of Appeals have divided. Rowen v. Commissioner, 2 Cir., 215 F.2d 641, and Pearlman v. Commissioner, 3 Cir., 153 F.2d 560, from which the expressions just quoted are respectively taken, are typical of the opposing views.

We have not had occasion to engage in specific preoccupation with the direct question, although we have previously made the general declaration, in Botz v. Helvering, 8 Cir., 134 F.2d 538, 542, that "Whether a transferee is liable 'at law or in equity' depends upon State law", and we have also, in Irvine v. Helvering, 8 Cir., 99 F.2d 265, and United States v. Hutcherson, 8 Cir., 188 F.2d 326, made application of state law to the alleged liability which was in those situations being sought to be enforced against a transferee.

It is sufficient for present purposes that the law of Missouri affords a proper basis for the liability which was enforced against petitioner out of the benefits of the matured insurance annuity contract. We accordingly stop our consideration there. This also makes it unnecessary to give consideration to the Government's contention that the policy here was in its nature rather an investment contract than an insurance one, and that it ought therefore to be regarded as being outside the operation of the Missouri statutes. It had, however, an insurance aspect, which was to exist until its endowment maturity date was reached; the premium paid was an integrated one for both its investment and insurance features; and the cash surrender value for which it provided was in release and termination of all its obligations. In this situation, it is enough that liability is not capable of being escaped on the basis of petitioner's own contentions, without attempting to reach out and pioneer some undetermined question of state law not passed on by the trial court, as a basis on which to predicate our result.

Affirmed.