BURNETT SCHWARTZ, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Schwartz v. Commissioner
Docket Nos. 8255-72, 8379-72.
United States Tax Court
T.C. Memo 1975-267; 1975 Tax Ct. Memo LEXIS 105; 34 T.C.M. (CCH) 1146; T.C.M. (RIA) 750267; August 19, 1975, Filed Burnett Schwartz, pro se. John B. Turner, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $37,730.32 in estate tax of the Estate of Sam Melman, Jr., Deceased, plus an addition of $1,886.52 under section 6651(a), [2] and has asserted personal liability against petitioners for the tax as executors pursuant to section 3467 of the Revised *106 Statutes of the United States (31 U.S.C., sec. 192). We are asked to decide whether petitioners are personally liable for the estate tax owing and whether such deficiencies should be assessed against petitioners. By stipulation of the parties, respondent assumed the burden of proof. Trial was held in St. Louis, Missouri, on March 19 and 20, 1974. FINDINGS OF FACT Certain facts were stipulated by the parties and are so found. Sam Melman, Jr., (hereinafter sometimes referred to as the decedent) a resident of St. Louis, Missouri, died on November 1, 1967. The will was filed for probate in the Probate Court of the City of St. Louis, File No. 139029. Burnett Schwartz, Max L. Raskin, and Gene J. Melman were duly appointed executors of the Estate of Sam Melman, Jr., Deceased, by that Court on November 22, 1967. On August 19, 1969, the executors filed a United States estate tax return with the District Director, Internal Revenue Service, St. Louis, Missouri. The return showed a taxable estate of $134,085.59, and an estate tax of $29,820.31. *107 The estate tax return of the Estate of Sam Melman, Jr., Deceased, has been audited by the Internal Revenue Service, and the liability has been the subject of litigation in this Court as Docket No. 8300-72. That case has been settled, and it is agreed for purposes of this case that the estate tax liability of the Estate of Sam Melman, Jr., Deceased, is $29,820.31. In addition, there is due from the estate an amount of $1,491.02, which is an addition to the tax imposed for late filing under section 6651(a), amounting to a total estate tax of $31,311.33, plus interest. No payment of estate tax was made when the return was filed nor has such payment been made thereafter. The estate was composed of two principal assets both of which were related to businesses owned and operated by decedent during his life. The larger of the two assets was 2,263 shares of common stock of DuroChrome Corporation (hereinafter DuroChrome), representing 71 percent of all outstanding shares of that corporation. DuroChrome, a Missouri corporation organized in 1929, manufactured commercial seating equipment sold nationally through territorial sales representatives. Decedent acquired his interest in DuroChrome *108 in 1954. He acted as its president and managed its day-to-day affairs. DuroChrome was operating successfully and was showing a profit at the time of decedent's death. The estate's other significant asset was decedent's interest in Melman Fixture Company (hereinafter Melman Fixture) a corporation wholly owned by him. Melman Fixture was the decedent's original business. It manufactured seating equipment and seating parts and acted as partial supplier for DuroChrome. Although it had shown losses for several years prior to his death, decedent was reluctant to dispose of it as a matter of sentiment. At the date of death, decedent was indebted to DuroChrome in the amount of $214,336.05. The books and records of Melman Fixture showed an obligation due the decedent in the amount of $142,727.00. Due to Melman Fixture's dependency on personal services of the decedent and a period of successive losses, the stock of that corporation was valueless on the date of decedent's death. The DuroChrome stock held by decedent's estate had a value of approximately $400,000 on the date of decedent's death. But with decedent no longer managing its business, DuroChrome suffered reversals in 1969 and *109 1970, its financial statements reflecting respective losses of $137,163 and $519,437 for those years. For the first quarter of 1971, the records showed a loss of $125,217 for the period ended March 31, 1971. On August 17, 1971, DuroChrome made a common law assignment for the benefit of creditors. On that date, the stock of DuroChrome held by the estate was valueless. During the administration of the estate, various distributions from its assets were made. The largest of these distributions was made pursuant to a settlement of a probate dispute with the decedent's widow, Florence Melman (Florence). This settlement was occasioned when, contrary to an ante-nuptial agreement into which she had entered, Florence expressed an intention to claim a one-third interest in the estate under section 474.160, Revised Statutes of Missouri, 1949. [3]
*110 The executors of the estate entered into negotiations with Florence, and having arrived at a tentative agreement with her, filed a petition in the Probate Court for the City of St. Louis seeking permission to enter into the agreement. The agreement provided that Florence would receive the following: (1) Allowance for exempt property as a surviving spouse; [4]
(2) Family allowance in the amount of $25,000; [5]
(3) Homestead allowance in the amount of $7,500; [6]
(4) In full satisfaction of her claim in electing to take against the will, Florence agreed to accept the sum of $75,500 plus a Lincoln automobile, valued at $2,545. In total, she was to receive a sum of $110,545. *111 The agreement called for an immediate cash payment of $50,000, comprising the family allowance, homestead allowance, and partial settlement of the claim. The remaining portion of the settlement was to be paid in 29 monthly installments of $1,000 with a lump sum payment of $29,000 at the end of 29 months. The Lincoln automobile was to be distributed immediately. Approval of this agreement in settlement was granted by the Probate Court on September 16, 1969. At the time of the settlement with Florence the estate had virtually no cash and few, if any, assets of significance other than the DuroChrome stock. At this same time, Melman Fixture, which was indebted to the estate, had cash in the amount of $50,000 in an account at the First National Bank in St. Louis. Melman Fixture owed the same bank approximately $75,000 on a note co-signed by the decedent. In order to induce the bank to release the funds of Melman Fixture held by the bank in the account, the executors pledged the estate's DuroChrome stock as collateral for the $75,000 note owed the bank by Melman Fixture. After due consideration of all facts and testimony in evidence, we find that on this date, September 16, 1969, the *112 value of the DuroChrome stock held by the estate did not exceed $250,000. On September 16, 1969, immediately after the settlement agreement with Florence, the estate's financial position was reflected in the relative values of its assets and liabilities at that time as follows: Assets
DuroChrome stock (71% of all
outstanding shares)
$250,000.00
Melman Fixture Receivable
115,000.00
Miscellaneous Assets
32,800.13
$397,800.13
Liabilities
Debt due DuroChrome
$214,336.05
Debt due Florence Melman
110,545.00
Debt due Philip Melman
6,000.00
Debt due First Nat'l Bank
in St. Louis for which
DuroChrome stock was pledged
75,000.00
Estate tax liability
31,311.33
Court costs
750.00
Debt due First Nat'l Bank in
St. Louis
8,400.00
Debt due First Nat'l Bank of
East St. Louis
17,968.03
Debt due Schimmel Furs
1,066.05
Debt due First Nat'l Bank in
St. Louis
16,732.73
Debt due State Bank and Trust
Co. of Wellston
2,250.00
Executor's fees due Schwartz
and Raskin [7]
26,000.00
Debt due Frontenac Management
Corp.
4,980.00
$515,339.19
*113 The $50,000 released by the bank was then turned over to Florence in satisfaction of the first payment of the settlement agreement. Twenty-two additional payments of $1,000 each were made between October 16, 1969 and July 16, 1971. The remainder of the payments called for by the agreement was never completed. After September 16, 1969, the distributions of assets from the estate were as follows: Distributee
Date
Amount
Purpose
Philip Melman, 9-26-69
$ 1,000
Payment of debt owed
Brother of Deceased
by decedent 9-29-69
500
Florence Melman, 9-29-69
25,000
Family allowance
Wife of deceased
7,500
Homestead allowance
17,500
Distribution to an
heir 9-30-69
2,545
Value of Lincoln
automobile repre-
senting a distribu-
tion to an heir
10-16-69
1,000
Distribution to an heir
11-16-69
1,000
Distribution to an heir
12-16-69
1,000
Distribution to an heir 1-16-70
1,000
Distribution to an heir 2-16-70
1,000
Distribution to an heir 3-16-70
1,000
Distribution to an heir 4-16-70
1,000
Distribution to an heir 5-16-70
1,000
Distribution to an heir 6-16-70
1,000
Distribution to an heir 7-16-70
1,000
Distribution to an heir 8-16-70
1,000
Distribution to an heir 9-16-70
1,000
Distribution to an heir
10-16-70
1,000
Distribution to an heir
11-16-70
1,000
Distribution to an heir
12-16-70
1,000
Distribution to an heir 1-16-71
1,000
Distribution to an heir 2-16-71
1,000
Distribution to an heir 3-16-71
1,000
Distribution to an heir 4-16-71
1,000
Distribution to an heir 5-16-71
1,000
Distribution to an heir 6-16-71
1,000
Distribution to an heir 7-16-71
1,000
Distribution to an heir
Total Amount Actually Paid
$76,045
*114 The three executors resigned around the time of DuroChrome's bankruptcy with the entire estate tax liability still owing. Schwartz submitted to the Probate Court a letter of resignation as executor of the estate on June 16, 1971. Raskin resigned on July 8, 1971 and died on September 8, 1971. Subsequently, Schwartz filed a claim totalling $26,000 for executor's fees in his own behalf and in behalf of the Estate of Max L. Raskin, whom he was representing. At some later date, Gene Melman submitted his resignation which resulted in the introduction of an executor appointed by the Probate Court on January 21, 1972. From December 31, 1970, through the present date, the estate's liabilities have totalled at least $420,000.00. Since the DuroChrome stock is now valueless, the estate is hopelessly insolvent and unable to meet its obligations, including the estate tax liability still due and owing. In his notices of deficiency to Burnett Schwartz and the Estate of Max L. Raskin, Raskin having died in the interim, respondent asserted that the petitioners, as executors, had paid debts of the estate without first discharging the estate tax liability still due and owing and determined personal *115 liability under section 3467 of the Revised Statutes of the United States (31 U.S.C., sec. 192) in the amount of the ultimate estate tax liability, later determined to be $31,311.33. ULTIMATE FINDING OF FACT On September 16, 1969, the Estate of Sam Melman, Jr., Deceased, was insolvent. OPINION The issue presented is whether petitioners are personally liable for the estate tax of the Estate of Sam Melman, Jr., Deceased. Respondent contends that under the Revised Statutes of the United States, sections 3466 [8] and 3467 [9] (31 U.S.C., sections 191 and 192) petitioners' payments of the estate's debts before satisfaction of the Federal estate tax liability rendered them personally liable for the tax. *116 Personal liability under the Revised Statutes arises only upon the insolvency of the estate involved, and then only to the extent that debts are paid after insolvency exists. United States v. Lutz,295 F.2d 736 (5th Cir. 1961). Petitioners argue first, that the payments to decedent's widow were not "debts" within the meaning of the Revised Statutes. A fiduciary is liable under the provisions of the Revised Statutes, sections 3466 and 3467, supra, only to the extent of debts he pays which do not have priority over debts due the United States. Leon G. Grieb,36 T.C. 156 (1961). It is well established that payments to a beneficiary in satisfaction of his distributive share of an estate are treated as "debts" within the meaning of the Revised Statutes. Estate Tax Regs., sec. 20.2002-1; [10]Malcolm D. Champlin,Administrator,6 T.C. 280 (1946); Helen Dean Wright,28 B.T.A. 543 (1933). Recognized exceptions include widow and family allowances allowed by a state probate court. Grace McKnight,15 T.C. 730 (1950); May R. Kieferdorf,1 T.C. 772 (1943); Jessie Smith, Executrix,24 B.T.A. 807 (1931). *117 In this case, there was a probate dispute in which decedent's widow, Florence Melman, made a claim against the will as surviving spouse pursuant to section 474.160 of the Revised Statutes of Missouri, 1949.[11] In a settlement of the dispute, the executors agreed to pay her $25,000 designated as family allowance, and $7,500 designated as homestead allowance. The remainder of $78,045 was to be paid in full satisfaction of her claim to elect against the will. This settlement received the approval of the Probate Court of the City of St. Louis. We therefore conclude that the Federal tax priority conferred by the Revised Statutes extends over the entire amount paid to Florence with the exception of the *118 $25,000 designated "Family allowance" with the approval of the Probate Court. [12] See May R. Kieferdorf,supra, at 778. Petitioners' second contention is that respondent has failed to establish insolvency of the estate at the time of the distributions. He argues that certain assets had a higher value and, as a result, no transfer took place while the estate was insolvent or that any such transfer did not cause insolvency. We conclude that the record as a whole is to the contrary and accordingly, we disagree. Even so, assuming the extreme possibility that the estate was not insolvent on the date of the agreement with Florence, respondent's burden has nevertheless been carried. Generally an executor is liable for estate tax to the extent he pays debts of the estate after it has become insolvent. However if while the estate is solvent a series of transfers is planned, then the estate is deemed to have been insolvent throughout the *119 series of transfers if any one of them is made after the estate has become insolvent. Benoit v. Commissioner,238 F.2d 485 (1st Cir. 1956), affg. on this issue 25 T.C. 656 (1955); J. Warren Leach,21 T.C. 70 (1953); Borall Corporation v. Commissioner,167 F.2d 865 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Botz v. Helvering,134 F.2d 538 (8th Cir. 1943), affg. 45 B.T.A. 970 (1941). [13]
On September 16, 1969, an agreement was made whereby Florence would receive a total sum of $110,545 in a series of installments. At this time the estate's principal asset was the DuroChrome stock worth $250,000. Installments began pursuant to this agreement on September 19, 1969, and continued through July 16, 1971. On August 17, 1971, DuroChrome made a common law assignment for the benefit of creditors; its stock was valueless. The estate's liabilities were at all times greater than $400,000. If in fact the estate were *120 not already insolvent as a result of the agreement of September 16, 1969, there is no doubt but that at some point in time while payments to Florence were being made pursuant to the agreement, the DuroChrome stock declined in value sufficiently so as to render the estate insolvent. Were insolvency not already established at the initial time of the agreement, insolvency was self-evident at some point while distributions were being made to Florence. These payments were part of a series emanating from the previously planned settlement agreement which resulted in the ultimate insolvency of the estate. Assuming this to be the case, and if it were the last of this series of transfers that rendered the estate insolvent, we agree with respondent's contention that we could impute that condition throughout. See Benoit v. Commissioner,supra;Borall Corporation v. Commissioner,supra,Botz v. Helvering,supra.
We have no doubt whatsoever on this record that if insolvency must be shown as of the date of the agreement, it has been clearly and convincingly established here. Accordingly, we hold the petitioners personally *121 liable for the estate tax pursuant to the provisions of the Revised Statutes of the United States. Decisions will be entered under Rule 155.
Footnotes
1. The cases of Burnett Schwartz, Docket No. 8255-72 and Estate of Max L. Raskin, Deceased, Docket No. 8379-72 are consolidated herein.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. Revised Statutes of Missouri, 1949, sec. 474.160 provides in part: ELECTION BY SURVIVING SPOUSE TO TAKE AGAINST WILL, EFFECT. 1. When a married person dies testate as to any part of his estate, a right of election is given to the surviving spouse solely under the limitations and conditions herein stated: (1) The surviving spouse, upon election to take against the will, shall receive in addition to exempt property and the allowance under section 474.260 one-half of the estate, subject to the payment of claims, if there are no lineal descendants of the testator; or, if there are lineal descendants of the testator, the surviving spouse shall receive one-third of the estate subject to the payment of claims; (2) When a surviving spouse elects to take against the will he shall be deemed to take by descent, as a modified share, such part of the estate as comes to him under the provisions of this section, and shall take nothing under the will; * * *↩
4. Revised Statutes of Missouri, 1949, sec. 474.250 provides: EXEMPT PROPERTY OF SURVIVING SPOUSE OR MINOR CHILDREN. The surviving spouse, or unmarried minor children of a decedent are entitled absolutely to the following property of the estate without regard to its value: The family bible and other books, all wearing apparel of the family, all household electrical appliances, all household musical and other amusement instruments and all household and kitchen furniture, appliances, utensils and implements. Such property shall belong to the surviving spouse, if any, otherwise to the unmarried minor children in equal shares. ↩
5. Revised Statutes of Missouri, 1949, sec. 474.260 provides in part: FAMILY ALLOWANCE OF SPOUSE AND MINOR CHILDREN. 1. In addition to the right to homestead allowance and exempt property, the surviving spouse is entitled to a reasonable allowance in money out of the estate for his maintenance during the period of one year after the death of the spouse, according to his previous standard of living, taking into account the condition of the estate of the deceased spouse. * * * ↩
6. Revised Statutes of Missouri, 1949, sec. 474.290 provides in part: HOMESTEAD ALLOWANCE--PARTITION OF REAL ESTATE SELECTED, PROCEDURE -- WAIVER. 1. * * * (The) court, on application of the surviving spouse * * * shall make an allowance to the surviving spouse * * * of an amount not not exceeding fifty percent of the value of the estate, exclusive of exempt property, and the allowance made under section 474.260, but in no case shall the allowance exceed seven thousand five hundred dollars.↩ Such allowance shall be known as a homestead allowance and is in addition to the exempt property and the allowance to the surviving spouse and unmarried minor children under section 474.260. The homestead allowance is exempt from all claims against the estate. The homestead allowance shall be offset against the share to which the surviving spouse or any minor child who receives it is entitled as a distributee of the estate, but the allowance shall not be diminished if it is greater than the distributive share. (Emphasis supplied.)
7. Although the formal claims for executor's fees were filed later, we find that Schwartz, as an attorney, considered these expenses for his and his colleague's services to be already incurred, and as such, are includable as a liability of the estate on this date.↩
8. Revised Statutes of the United States, sec. 3466 (31 U.S.C., sec. 191 (1954)) provides in part as follows: Whenever any person indebted to the United Sttes is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due the United States shall be first satisfied; * * * ↩
9. Revised Statutes of the United States, sec. 3467 (31 U.S.C., sec. 192 (1954)) provides in part as follows: Every executor * * * who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debt so due to the United States, or for so much thereof as may remain due and unpaid. * * *↩
10. Estate Tax Regs., sec. 20.2002-1, provide in part as follows: As used in said section [31 U.S.C., sec. 192↩], the word "debt" includes a beneficiary's distributive share of an estate. Thus, if the executor pays a debt due by the decedent's estate or distributes any portion of the estate before all the estate tax is paid, he is personally liable, to the extent of the payment or distribution, for so much of the estate tax as remains due and unpaid. * * *
11. See footnote 3, supra.↩
12. In view of the relative amounts involved, it is not necessary that we decide the priority of the amount designated "Homestead allowance" in this case and we expressly refrain from so doing.↩
13. Similar results were reached by this Court in Irving Don,T.C. Memo. 1971-130 and Burton Ginsberg,T.C. Memo. 1965-36↩.