BORALL CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

UNGERLEIDER v. SAME.

HALL v. SAME.

Nos. 109–111, Dockets 20639–20641.

Circuit Court of Appeals, Second Circuit.

May 4, 1948.

---

[1] The chief mate asserted that "the top layer of cases were in perfect shape, the same as we put them on."

Leo Brady and Gordon, Brady & Keller, all of New York City (Leo Brady, Herman Keller, and Leroy C. Curtis, all of New York City, of counsel), for appellants.

Theron Lamar Caudle, Asst. Atty. Gen., and Helen R. Carloss, George A. Stinson and Carlton Fox, Sp. Assts. to Atty. Gen., for appellee.

Before AUGUSTUS N. HAND, CLARK and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

These consolidated petitions for review of three decisions rendered by the Tax Court of the United States in consolidated proceedings involve the income tax and declared value excess-profits tax liability of the Borall Corporation for its taxable year ending March 31, 1940, and the liability for those taxes of two of its stockholders as transferees of its assets.

The Borall Corporation was organized under the laws of Delaware for the purpose of engaging in the general investment business. Its office, while it had one, was located in the City and State of New York and its tax return for the period under consideration was filed with the Collector for the Second District of New York. It had an authorized capital stock of 8,000 shares of $10 par value preferred and 5,800 shares of $1 par value common.

At its organization Borall issued 7,700 shares of its preferred stock and 4,640 shares of its common stock to the petitioner Hall in exchange for: (1) 16,500 shares of the common stock of the Thompson Automatic Arms Corporation; (2) a contract between Hall and Federal Screw Works allowing the former a commission on certain orders which he might obtain for the latter, and (3) 3,500 shares of the $1 par value common stock of M. J. Hall & Co., Inc. At the same time it also issued 580 shares of its common stock to one Mortimor S. Gordon in return for legal services and blocks of 75 shares of its preferred and 290 shares of its common to both the petitioner Ungerleider and to one Lowell A. Mayberry for which each paid $750. Hall promptly transferred 350 shares of his preferred stock to Gordon and 2,500 shares of his preferred stock to Ungerleider in payment of personal obligations to them, and subsequently he transferred 120 more of his preferred shares to one Aaron Sapier. As a result Borall's preferred stock was then owned as follows: Hall 4,730 shares, Ungerleider 2,575 shares, Gordon 350 shares, Sapier 120 shares, and Mayberry 75 shares, leaving 150 shares of preferred which apparently were never issued.

Hall, Ungerleider, Mayberry and Gordon constituted Borall's board of directors from its organization to its dissolution, and its officers during that interval were Hall, president; Mayberry, treasurer; and Gordon, secretary.

During April and May 1939 Borall maintained an office and paid Hall a salary. But its affairs did not prosper and in June its original cash capital of $1,500 contributed by Ungerleider and Mayberry was virtually exhausted. Under these circumstances the board of directors at a meeting held on June 28, 1939, voted to discontinue the salary to Hall and to give up the corporation's office, the minutes of that meeting containing the notation "After some further discussion it was the consensus of opinion that unless satisfactory

arrangements could be worked out, the corporation be liquidated and dissolved."

Borall was inactive after this meeting, but Hall personally undertook to provide it with working capital by a sale of its Thompson stock and to this end induced a brokerage firm to agree to purchase that stock for marketing purposes. Hall reported the result of his negotiations with the brokers to Borall's directors but two of them believed the Thompson stock to be worth more than the brokerage firm would pay for it and refused to allow the corporation to sell. As a result of this deadlock the directors decided to dissolve Borall and liquidate its assets.

To accomplish this the board of directors held a meeting on September 9, 1939, the original minutes of which recite that "After considerable discussion and due to the uncertainty of market conditions, it was determined in order to permit individual shareholders to act in accordance with their individual views, to declare a liquidating dividend on the outstanding preferred shares of this corporation payable to holders of record as of September 11, 1939, of $8.00 a share payable in cash or in two (2) shares at the valuation of $4.00 per share of Thompson Automatic Arms Corporation Stock." At this meeting it was then resolved: (1) That Borall "distribute" its 16,500 shares of Thompson stock "as a liquidating dividend" to the holders of Borall's issued and outstanding preferred stock; (2) "that such shares be delivered to or sold for the account of said shareholders as full and final payment of such dividend and as set forth in these resolutions"; (3) that Borall "declare and pay" to its preferred stockholders of record as of the close of business September 11, 1939, "a liquidating dividend of $8.00 per share payable in cash or in two (2) shares of Thompson Automatic Arms Corp. stock at the valuation of $4.00 per share, free of tax and delivery charges at the election of such shareholder, such election to be designated in writing by letter addressed to this corporation on or before September 11, 1939"; and (4) that Hall be authorized on behalf of Borall to enter into a contract with the brokerage firm of Clokey & Miller for the sale at $4.00 per share of "so many of the shares of this corporation as shall be required to satisfy the election of preferred shareholders in accordance with the above resolution."

Ungerleider and Mayberry duly elected to take shares of Thompson stock "in full payment, discharge and satisfaction of the Eight Dollar ($8.) liquidating dividend declared" by Borall, and Hall, Gordon and Sapier elected "to receive the liquidating dividends in cash."

Thereupon, at a meeting of Borall's directors held on September 14, 1939, it was voted to deliver all 16,500 shares of Borall's Thompson stock to a New Jersey bank as custodian, and to authorize the sale of 11,200 shares of that stock by Clokey & Miller at $4.00 per share. On September 22, 1939, the bank delivered 5,150 shares of Thompson stock to Ungerleider and 150 shares to Mayberry, that being two shares of Thompson stock for each preferred share of Borall held by them, and the remaining 11,200 shares were subsequently sold, under modifications of the agreement with Clokey & Miller, by that brokerage firm and by another, at prices ranging from $4.00 down to $3.00 per share. The proceeds of the sales of the first 10,400 shares of Thompson stock sold were distributed ratably to Hall, Gordon and Sapier on various dates between September 23, 1939, and February 6, 1940, but the proceeds of the sale of the remaining 800 shares were for some unexplained reason later distributed ratably to all of Borall's five preferred shareholders, including Ungerleider and Mayberry, although the latter had elected to take Thompson stock in lieu of cash in full payment of Borall's liquidating dividend. This distribution of cash and the fact that part of the Thompson stock was sold for less than $4.00 per share resulted in a distribution to the three stockholders of Borall who elected to take their liquidating dividend in cash of only $7.00 per share for their stock. None of them appear to have complained, however, or to have made any demand upon Borall.

Borall was officially dissolved early in July 1940, and its remaining assets (the contract between Hall and Federal Screw Works and the stock of M. J. Hall & Co., Inc.) which the Tax Court found had no

fair market value, were transferred to Hall for a nominal consideration a few days later. Thus when Borall's liquidation was complete it was left without any assets whatever.

Borall reported no income for its fiscal year beginning with its organization on April 1, 1939, and ending March 31, 1940, but the Commissioner after an examination of its books and records determined otherwise. He took the view that the 11,200 shares of Thompson stock sold though brokers had been sold by Borall on its own behalf and that it had realized a taxable gain from the transaction of $24,837 during the taxable year in question. Therefore he determined deficiencies in Borall's income tax and declared value excess-profits tax for that period of $3,255 and $2,797.50 respectively, and, since it was a dissolved corporation without assets and both Ungerleider and Hall as former stockholders had received more than the amount of the above taxes as liquidating dividends, he held that they were liable for those taxes as transferees.

The petitioners did not contend before the Tax Court and do not contend here that the Commissioner's computations of tax were erroneous. They have taken the position from the outset that there was no basis for the imposition of any tax at all for the reason that the 11,200 shares of Thompson stock were not sold by Borall on its own account but were sold by it as the agent for Hall, Gordon and Sapier individually, and hence that it was not taxable on any gain resulting from that sale.

The simple basic question then is whether Borall sold 11,200 of its 16,500 shares of Thompson stock for its own account and distributed the cash proceeds as a liquidating dividend to Hall, Gordon and Sapier, or whether it distributed that stock to them in specie as such a dividend and thereafter sold it for their account as their agent. And this question has been resolved against the petitioners by the Tax Court. It said in its unreported opinion of October 30, 1946: "We think the corporate minutes and resolutions and subsequent sale and distribution in accordance therewith indicate that it was intended that Ungerleider and Mayberry were to receive Thompson stock

in kind and Borall was to sell the remaining Thompson stock for itself, and distribute the cash as had been agreed upon." Therefore it concluded "that the sale of the Thompson stock was by the corporation and the profits from the sale inured to and are taxable to the corporation," and hence it sustained the Commissioner's determinations of deficiencies in Borall's income and declared value excess-profits taxes. Furthermore the Tax Court sustained the Commissioner's determinations of deficiencies against Hall and Ungerleider based upon their liability for those taxes as transferees of Borall.

The petitioners first contend that the Tax Court, in determining that the sale of the 11,200 Thompson shares was made by Borall for its own account, failed to apply a clearcut principle of law in that it mistakenly failed to rule that the resolution of Borall's directors of September 9, 1939, to liquidate, and as a liquidating dividend to distribute its 16,500 Thompson shares to its preferred shareholders, operated immediately to vest unconditional title to those shares in Borall's preferred shareholders, a title which subsequent corporate action could not revoke or modify, so that in consequence Borall could not be taxed on any gain resulting from the sale of any of the Thompson stock. And they say, even assuming arguendo that Borall is liable for a capital gains tax as a result of the sale in question, that the Government has utterly failed to make out a case of transferee liability against Hall and Ungerleider for the reason that it has wholly failed to show that Borall was rendered insolvent by the distribution. The Commissioner on the other hand takes the position that both of the questions here presented are pure questions of fact with respect to which the findings of the Tax Court are conclusive since there is warrant in the record therefor.

Thus at the outset of our consideration of these petitions we are confronted with the question of the applicability of the rule in Dobson's case, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

It may well be that the first and fundamental question presented is not a question of fact in the traditional sense.

But whatever the pre-Dobson rule may have been, it seems to us that it is now firmly established that when there is room for doubt as to the tax consequences of transactions like those under consideration here, resolution of that doubt is not for tyros lacking "a roundly tax-informed viewpoint" (id. 320 U.S. at page 500, 64 S.Ct. at page 246) like ourselves, but it is for the expert, experienced and informed judgment of the Tax Court.

■ The basic rationale of the Dobson case is that any decision of the Tax Court which "is of little value as precedent" (Commissioner v. Scottish American Investment Co., Ltd., 323 U.S. 119, 125, 65 S. Ct. 169, 172, 89 L.Ed. 113) that is, which "can be reduced to its own particular circumstances rather than turn on a generalizing principle" (Commissioner v. Estate of Bedford, 325 U.S. 283, 292, 65 S.Ct. 1157, 1162, 89 L.Ed. 1611; see also Trust of Bingham v. Commissioner, 325 U.S. 365, at page 370, 65 S.Ct. 1232, 89 L.Ed. 1670, 163 A.L.R. 1175) is not for reexamination as an original proposition by the courts. In this class of cases we are admonished to check the propensity of the judicial eye to "rove about" in the first instance searching for evidence to support inferences and conclusions which we consider more reasonable or desirable than those reached by the Tax Court, and instead to cast it (the judicial eye) "directly and primarily upon the evidence in support of those made by the Tax Court." Commissioner v. Scottish American Investment Co., supra, 323 U.S. at page 124, 65 S.Ct. at page 171. For the judicial function is exhausted when a rational basis for the conclusion reached by that court is found in the evidence. Dobson v. Commissioner, supra, 320 U.S. at page 501, 64 S.Ct. 239, and cases cited. And there can be no doubt that the case at bar falls into this class because the rule of law is clear that there is no capital gains tax on the corporation if its stockholders received the assets in kind and thereafter sold them for their own account, even though they employed the corporation as their agent in that transaction, the only problem being to apply that rule to the particular and peculiar facts here presented.

Several cases decided by the Supreme Court in recent years support our conclusion to apply the Dobson rule. In Choate v. Commissioner, 324 U.S. 1, 3, 4, 65 S.Ct. 469, 470, 89 L.Ed. 653, the court held that whether a certain transaction resulted in a cash sale or a sub-lease "is the kind of issue reserved for the Tax Court under Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239 [88 L.Ed. 248], and Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167, 168, 62 S.Ct. 984, 985, 986, 86 L.Ed. 1352," even though interpretation of the meaning of written documents was involved; and in cases more closely in point (John Kelley Co. v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278, and its companion case Talbot Mills v. Commissioner), the court held that it was for the Tax Court to decide whether annual payments made upon certain hybrid corporate obligations having elements of stock and elements of bonds were to be classified for tax purposes as declarations of dividends or payments of interest, since the usefulness of the judges of the Tax Court "lies primarily in their ability to examine relevant facts of business to determine whether or not they come under statutory language." 326 U.S. at page 529, 66 S.Ct. at page 304. Finally in Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, the Supreme Court applied the Dobson rule in considering the very question involved here, i.e., whether a sale of a corporate asset which had been transferred just previously by the corporation to its stockholders as a liquidating dividend was for capital gains tax purposes to be treated as a sale by the corporation or as a sale by the stockholders.

■ Therefore we see no occasion to discuss, or even recite in detail, all the factors, such as certain alterations in the minutes of the directors meetings of September 9, and September 14, 1939 (which were made after an internal revenue agent had examined them), the effect of which was to make them unequivocably indicate that the directors had voted to distribute the Thompson stock in kind as a liquidating dividend, and undisputed evidence that these alterations made the minutes clearly express the original intention of the directors. It will suffice to say that the corpo-

rate action of September 9, 1939, declaring a liquidating dividend of $8.00 per share and, "in order to permit individual shareholders to act in accordance with their individual views" to make that dividend "payable in cash or in two (2) shares of Thompson Automatic Arms Corp. stock at the valuation of $4.00 per share * * * at the election of such shareholders," and the fact that two shareholders actually elected to take, and took, Thompson stock and the others cash, provides a substantial basis for the finding and conclusion of the Tax Court.

There remains for consideration, however, the asserted rule of law that the resolution of September 9, 1939, to "distribute" all of Borall's shares of Thompson stock to Borall's stockholders "as liquidating dividend" operated then and there to vest full, complete and unconditional title to the Thompson stock in the stockholders, which title could not be altered, modified or cut down by subsequent conflicting action by Borall's directors. The facts do not call for application of the asserted rule of law for the reason that controlling effect is not to be given to one item of corporate action to the exclusion of other conflicting items of corporate action taken on the same day. The transactions of that day are not to be broken up into separate parts. Instead they are to be viewed together as a whole, and so viewed we cannot say that it was unmistakably voted to distribute the Thompson stock in kind to Borall's stockholders as a liquidating dividend for to do so we would have to ignore the resolution to pay the liquidating dividend in cash or shares of Thompson stock at the stockholder's election and the resolution to sell as much of the Thompson stock as might be required to meet such election.

The contention of the two individual petitioners that the Commissioner has failed to sustain his burden of proving their transferee liability can be disposed of briefly.

This contention rests upon the proposition that the Commissioner has failed to show that Borall was insolvent after its Thompson shares were disposed of since it still had other assets remaining (the Federal Screw Works contract and

the stock of M. J. Hall & Co., Inc.), which it is said the Commissioner claims, but failed to introduce evidence to prove, were valueless. The short answer to this is that after dissolution Borall's directors admittedly transferred these assets to Hall for a nominal consideration, and this, at least in the absence of any evidence by the petitioners as to the value of these assets, is sufficient to warrant the Tax Court's inference that they had no market value. Furthermore, even though the payment of cash to Hall and the delivery of Thompson stock to Ungerleider may not have rendered Borall insolvent at the moment, both distributions were made in liquidation, and the rule appears to be established that any transfer in the requisite amount which is one of a planned series of distributions in liquidation results in such insolvency as to impose transferee liability. Botz v. Helvering, 8 Cir., 134 F.2d 538, 543.

The decisions of the Tax Court are affirmed.