JOHN OWNBEY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
JOHN OWNBEY CO. v. COMMISSIONER
Docket No. 7469-74.
United States Tax Court
T.C. Memo 1978-482; 1978 Tax Ct. Memo LEXIS 33; 37 T.C.M. (CCH) 1849-47; November 30, 1978, Filed *33 Held, petitioner's transferee liability determined. W. L. Ambrose, Jr., and Dudley W. Taylor, for the petitioner. William Robert Pope, for the respondent. WILES
MEMORANDUM FINDING OF FACT AND OPINION WILES, Judge: Respondent determined that John Ownbey Company, Inc. (hereinafter Ownbey), was liable as a transferee under section 6901 [1] in the amount of $41,046. The sole issue is Ownbey's liability, if any, as a transferee. FINDINGS OF FACT Some facts were stipulated and are found accordingly. Ownbey, a Tennessee corporation, maintained its principal office and place of business in Knoxville, Tennessee, when it filed its petition in this case. Ownbey was in the business of manufacturing clothing. *35 In 1968, but prior to October 29, 1968, Russell Miller purchased all the stock of Ownbey by giving a note to Herman D. Wynn, his brother-in-law. Wynn is a financier who has had many business involvements including the production of government goods under renegotiable contracts. Miller and Wynn had a business and personal association since 1930. Wynn suggested that Miller have Ownbey purchase all the stock of International Textile Products, Inc. (hereinafter International). He advised that a profit could be made on the purchase. On October 29, 1968, Ownbey purchased International's stock for $105,000 plus temporary compensation of old officers. Ownbey agreed, among other things, to hold the sellers harmless on any liability which might arise against International from the Internal Revenue Service or renegotiation of government contracts. International reflected a net profit of $487,322.03 for the ten and one-half months ending on October 15, 1968.The balance sheet for the same period was as follows: ASSETS
Cash in Bank
$ 383,966.81
Government Securities
150,000.00
Accounts Receivable
30,452.10
Equipment (office and autos)
$ 17,036.66
Less - Reserve for Depreciation
(estimated)
4,000.00
13,036.66
Deposits
1,842.00
$ 579,297.57
*36 LIABILITIES AND NET WORTH
LIABILITIES
Accounts Payable
$ 67,800.00
Accrued and Withheld Items
6,591.43
Total Liabilities
$ 74,391.43
NET WORTH
Capital Stock
$ 10,500.00
Retained Earnings
12-1-67 $ 7,084.11
Earnings -
Year to date
487,322.03
494,406.14
504,906.14
$579,297.57
Prior to Ownbey's acquisition of International's stock, the latter had been manufacturing tents and tarpaulins under a renegotiable government contract at its leased plant at La Follette, Tennessee. Wynn was aware, prior to the acquisition of International, that its government contracts had expired. Although International did not obtain any other government contracts after its acquisition, Wynn knew that the old contracts might be renegotiated. The fear of renegotiation precipitated Ownbey's bargain purchase of International's stock. Wynn was an officer of International prior to Ownbey's acquisition of the company and he agreed to remain as its chief operating officer and to represent International on its contract renegotiations. In May or June, 1968, prior to Ownbey's acquisition of International, Wynn contacted Juvenille Manufacturing Company, *37 Inc., which later changed its name to Santone Manufacturing Company (hereinafter Santone) on Ownbey's behalf in response to Santone's ad seeking contracts to make boys suits and sport coats. After negotiations with Wynn, Ronald T. Monford, Santone's representative, agreed to visit Wynn's production facilities in Knoxville. Since Wynn was unavailable, Monford met with Miller and they discussed Ownbey's willingness to work on the contract and orally agreed to prices, delivery schedules, and various other matters. Upon Monford's return to Santone he wrote Miller a letter on November 16, 1968, confirming the oral agreement reached on the terms of the contract while he was in Knoxville. During the course of the contract, Monford visited Knoxville several times to observe production first in the Ownbey building and subsequently in a building previously owned by Wynn. Throughout the term of the contract, Miller was Monford's day-to-day contact on production under the agreement. Miller understood the Santone contract was International's. Under the contract, Santone would send, or have sent, piece goods to Ownbey who would cut the material using Santone's patterns, markers and specifications. *38 The cut goods were then sewn into completed coats and shipped back to Santone. The cutting process was similar to Ownbey's existing government contract under which it produced Army field jackets. Monford was aware, and Santone approved, the subcontract of production of slacks under the contract to M & W Sportswear, Inc. (hereinafter M & W). Monford understood that Miller was a fifty percent owner of M & W and that, therefore, Miller would exercise the same management control over the M & W production as he did over Ownbey's. Monford testified, however, that he never heard of International in his dealings with Ownbey. He was, therefore, only aware of one subcontract under Santone's contract with Ownbey -- that of M & W. Ownbey hired the employees for the jacket production under the Santone contract and they were paid by Ownby's payroll checks until February 14, 1970. The first production supervisor over the Santone contract, however, was paid by International although he assisted Ownbey on the hiring of employees. Subsequent production supervisors were hired and paid by Ownbey. On February 14, 1970, International issued its first payroll check to a production employee *39 under the Santone agreement. From February 14, 1970, until the termination of the Santone agreement International's payroll checks were issued to individuals working under the agreement. Owenby handled all the invoice billing under the Santone agreement on documents bearing the title "John Ownbey Company, Inc." The first invoice was dated January 21, 1969, and the last dated March 27, 1970. Each Santone check from the first check dated February 3, 1969, to the last, dated April 13, 1970, in payment of the invoices from Ownbey was made payable to Ownbey. The production of pants under the Santone contract was subcontracted to M & W. Ownbey shipped the piece goods for the manufacture of the pants to M & W who would bill Ownbey for the finished pants. Ownbey would then include the amount of M & W's invoice in its invoice to Santone. Dorothy Turner, employed by Ownbey since 1958, is the office manager and is in charge of bookkeeping. For the duration of the Santone contract, Turner was in charge of maintaining Ownbey's books with the exception of the accountant's year-end adjusting entries. Ownbey's and International's fiscal year ended with March 31 and November 30, respectively. *40 Turner established an account receivable for Ownbey to record sales to and receipts from the Santone contract. The account consists of five pages with a beginning date of January 21, 1969, and reveals no information indicating the account belonged to International. From November 11, 1968 to March 31, 1974, Ownbey maintained an account receivable for International. The account, consisting of three pages, reflected no information indicating any relationship to the Santone contract. Ownbey's accountants prepared working papers for the International account receivable for the periods ended March 31, 1969, 1970, and 1971. All of Ownbey's expenses as well as sales to Santone were charged to this account either by Turner or by the accountants through year-end adjusting entries. International maintained a notes receivable account to reflect transactions with Ownbey. For the period ended November 30, 1969, the accountant's adjusting entries to this account reflected a loss on the Santone contract of $14,161.76. This amount represented the unrecorded sales from Santone and unpaid costs to Owenby through November 30, 1969. Thus, for the period ending November 30, 1969, International *41 owed Ownbey $14,161.76 for the excess costs it had incurred over sales. In addition, the accountants' adjusting entries to Ownbey's account receivable for International for the period ending March 31, 1969, reflect that International actually paid Ownbey $15,642.07 for expenses Ownbey had incurred on the Santone contract. When the unpaid loss of $14,161.76 is added to the paid expenses of $15,642.07, a net loss of $29,803.83 results from the Santone contract for the period ending November 30, 1969. On March 31, 1970, International's note receivable account for Ownbey reflected a balance due Ownbey of $74,352.68. On May 31, 1970 and June 30, 1970, this account reflects a transfer of an oil royalty valued at $71,248.13 to Wynn, Inc., an Ownbey creditor, in partial satisfaction of the $74,352.68 liability International reflected in its note receivable account to Ownbey.This left a balance due Ownbey in the note receivable account of $3,104.55. Treating the $14,161.76 loss on the Santone contract reflected in the November 30, 1969, adjusting entries of International's note receivable account for Ownbey as the last credit in the total credit balance of $74,352.68, International's *42 transfer of its interest in the oil royalty was in exchange for the reduction of the Santone loss to the extent of $11,057.21, computed as follows: (a) Credit balance March 31, 1970
$ 74,352.68
Net loss from Nov. 30, 1969,
adjusting entries
(14,161.76)
Credit balance without net loss
$ 60,190.92
(b) Oil royalty transferred
$ 71,248.13
Credit balance without loss
(60,190.92)
$ 11,057.21
On November 30, 1970, three adjusting entries were made to International's note receivable for Ownbey.The first represents a sale of equipment to Ownbey for $15,609.65. The second adjusting entry was $2,648.80 and represented the loss on the Santone contract from December 1, 1969, to the termination of the contract on March 4, 1970. The third entry of $3,422.47 was, in part, to enter unrecorded sales not accounted for in the $2,648.80 loss. When combined, these last two entries reflected a net profit of $773.67 on the Santone contract for the period ending November 30, 1970.
As noted, on June 30, 1970, International's note receivable balance for Ownbey was $3,104.55 due Ownbey. This amount represented the unpaid net loss on the Santone contract for the period ending *43 November 30, 1969. This was completely offset by the sale of equipment for $15,609.65 which was a debit to the note receivable. The second adjusting entry of $2,648.80 on November 30, 1970, to reflect a loss on the Santone contract for the period beginning December 1, 1969, includes labor and overhead of $54,108.55. The amount paid to individuals working on the Santone contract by International's payroll checks is not included in the above adjusting entry. International paid $25,609.10 in its own payroll checks to individuals working on the Santone contract and paid $2,048.73 in payroll taxes on that amount for a total of $27,657.83. When the wages and employment tax paid directly by International are offset by the Santone profit of $773.67 reflected in the adjusting entries to International's note receivable from Ownbey for the period ending November 30, 1970, the result is a net loss of $26,884.16. International's balance sheet and income statement for the 10-1/2 months ending October 15, 1968, reflect excess assets of $504,906.14 before taxes and profit of $487,322.03. International's corporate federal income tax return for its fiscal year ended November 30, 1968, revealed *44 a tax liability of $240,476.99. On December 23, 1971, a notice of deficiency was issued to International asserting a deficiency of $165,543.59 and penalties of $8,282.18 for November 30, 1968. On September 4, 1970, $72,771.95 plus interest was refunded to International for the year ended November 30, 1968, as a result of a net operating loss carryback from the year ended November 30, 1969. The refund resulted from International's filing of a corporation application for tentative refund from carryback of net operating loss. The net operating loss for the year ended November 30, 1969, was, however, disallowed in the notice of deficiency mailed to International on December 23, 1971, on the ground that the losses incurred were on a contract upon which it was not legally liable. The revised income tax liability of International for the year ended November 30, 1968, following other adjustments, was $333,248.63. International's deficiency was computed as follows: Income tax liability
$ 333,248.63
Assessed per return
$ 240,476.99
Less: Refund
( 72,771.95)
$ 167,705.04
Deficiency
$ 165,543.59
International petitioned this Court for a redetermination *45 of the $165,543.59 deficiency for its year ended November 30, 1968. On April 16, 1973, this Court, pursuant to the agreement of the parties, entered a stipulated decision against International reflecting a deficiency of $163,264.46 for the year ended November 30, 1968. As of December 1, 1969, Schedule L of International's corporate federal income tax return for the year ending November 30, 1970, set out the following assets and liabilities: Assets
Cash
$ 39,560.00
Trade Notes and Accounts Receivable
225,419.00
Inventory
45,375.00
Oil Royalty
66,895.00
Buildings and other depreciable assets
less accumulated depreciation
20,740.00
Total assets
$ 397,989.00
LIABILITIES
Accounts Payable
174,214.00
Other current liabilities
119,220.00
Total liabilities
$ 293,434.00
As of November 30, 1970, Schedule L of International's corporate federal income tax return for the year ending November 30, 1970, set out the following assets and liabilities: Assets
Cash $ 39,158.00
Trade Notes and Accounts Receivable
86,672.00
Inventory
35,362.00
Oil Royalty
0
Buildings and other fixed depreciable
assets less accumulated depreciation
710.00
Total assets
$ 161,902.00
LIABILITIES
Accounts Payable
$ 101,424.00
Other current liabilities
58,306.00
Total liabilities
$ 159,730.00
*46 The parties agree that the assets and liabilities set out on Schedule L of International's corporate federal income tax return for the period ending November 30, 1970, are International's assets and liabilities at the value stated on that schedule for the purpose of determining International's insolvency under the laws of the State of Tennessee, except that Schedule L does not include International's deficiency in federal income tax for the year ending November 30, 1968, nor the federal income tax refund paid to International as a result of the net operating loss carryback from the taxable year ending November 30, 1969. As of December 1, 1969, and November 30, 1970, respectively, International's assets exceeded liabilities by $104,555 and $2,172 without considering the fiscal year 1968 tax deficiency or refund. International reported tax losses on its federal tax returns for its tax years ended November 30, 1969 and 1970. Wynn testified that the large losses during these two years were primarily related to losses in the retail clothing business and not the Santone contract. Moreover, International's government contracts expired before it was purchased by Ownbey and no government *47 contracts were ever renewed. On January 8, 1974, a payment of $1,960.12 was received on International's federal tax liability for its year ended November 30, 1968. The balance of that liability in the amount of $193,437.25 has not been paid and the parties agree that any efforts by respondent to collect it from International would be in vain. As a result, respondent assessed transferee liability under section 6901 against Ownbey in the amount of $41,046 plus any interest on that amount allowable under Tennessee law. OPINION We must determine whether Ownbey is liable to the extent of $41,046 as a transferee of International under section 6901(a)(1)(A)(i). If so, we must also decide whether Ownbey is liable for interest on that amount. Section 6901(a)(1)(A)(i) does not create tax liability. It is a procedural remedy to enforce the liability of the transferee as determined under state law; in this instance, Tennessee law. Commissioner v. Stern,357 U.S. 39, 45 (1958). Respondent has the burden of proving that Ownbey is liable as a transferee of property of International, but not to show that International was liable for the tax. Sec. 6902(a); Rule 142(d), *48 Tax Court Rules of Practice and Procedure.
The statutory liability of a transferee of a conveyance in Tennessee is set forth in Tenn. Code Ann. sec. 64-312 (1976 Replacement): [2]
Every conveyance made andevery obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration. Tenn. Code Ann. sec. 64-309 (1976 Replacement) defines insolvency as follows: A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.
Tenn. Code Ann. sec. 64-311 (1976 Replacement) defines fair consideration as follows: Fair consideration is given for property, or obligation, (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) when such property or obligation *49 is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained. Respondent's entire assertion of Ownbey's transferee liability is premised upon Ownbey's ownership of the Santone contract.Respondent argues that Ownbey caused its subsidiary, International, to absorb $41,045.92 in excess expenses over sales revenue on the Santone contract in International's tax year ended November 30, 1970. Respondent asserts that since the contract belonged to Ownbey and not International, the latter transferred assets to the extent of $41,045.92 for which it received no consideration; the cancellation of a loss on a contract not being fair consideration under Tennessee law.Finally, respondent argues that since International was insolvent at the time of the asset transfers to Ownbey, it is liable as a transferee under section 6901. Petitioner asserts as a threshold matter that the Santone contract belonged to International. We agree with respondent on this point. The record contains overwhelming evidence that the Santone contract belonged to Ownbey. On November 16, 1968, Monford *50 of Santone wrote a letter to Miller, president of Ownbey, confirming the terms of a prior agreement with Miller for the production of boys suits by Ownbey. Prior to this date, Monford had negotiated with Wynn concerning the production needs of Santone. These negotiations led to Monford's visit to Ownbey's plant in Knoxville, Tennessee, where he inspected Ownbey's facilities for production under the proposed contract. He met Miller upon arrival in Knoxville who showed him Ownbey's plant and then negotiated the specific terms of the contract between Ownbey and Santone. The production on the contract was at all times performed in Ownbey's production facilities utilizing only Ownbey production personnel. Only the first production supervisor over the Santone contract was associated with International. Moreover, he was replaced in January or February 1969, shortly after production began, by employees of Ownbey. During the performance of the contract, Monford made several inspection visits of Ownbey's production facilities. His primary contact throughout the contract was Miller, president of Ownbey. Monford testified that he had never heard of International although he approved Ownbey *51 subcontracting the production of pants to M & W. M & W billed Ownbey for their work under the contract and was paid by Ownbey. Ownbey, in turn, billed Santone for its work to which it added the M & W bill. Santone paid Ownbey for both its work and the work it subcontracted to M & W. The Santone contract production employees were paid by Ownbey except for the last few months of the contract. These factors clearly establish the contract belonged to Ownbey. Petitioner attempts to counter these factors through the testimony of Miller and Wynn to the effect that they intended the contract to be International's. It supports this position by reference to the facts that the books of Ownbey and Internationa treast the contract as International's and that International reported the loss on the Santone contract on its tax returns. We do not believe the internal accounting procedures of a parent company and its wholly owned subsidiary can overcome the representations of the parties in dealing with outside independent third parties. The contract was clearly between Ownbey and Santone and approved by Miller and Monford. Moreover, the actions of the parties during production under the *52 contract in no way leads us to believe this condition changed. We are not unmindful of petitioner's evidence; we simply find respondent's evidence more credible and persuasive on the record before us. Finally, petitioner argues in its reply brief that even if the contract originally belonged to Ownbey, that it effectively assigned the contract to International. But as we have already discussed, the continuing conduct of Ownbey in dealing with Santone during the performance of this contract belie this contention. Moreover, the record contains no reference to an instrument of assignment or even an oral agreement to assign this contract to International. Accordingly, we find as a threshold matter, that the Santone contract was a binding obligation of Ownbey's. Having so found, we now turn to an examination of whether respondent has established Ownbey's transferee liability. For respondent to establish Ownbey's liability under Tennessee law he must establish that (1) a conveyance was made, (2) while International was insolvent, or would be rendered insolvent by the transfers, and (3) without fair consideration to support the conveyance. First, with regard to the element of *53 conveyance, respondent asserts that International transferred assets to and for the benefit of Ownbey in an amount equal to or greater than $41,045.92 during International's tax year ended November 30, 1970. He contends that $41,045.92 consisted of transfers of an oil royalty, equipment, and money. Respondent contends that the entries of May 31 and June 30, 1970, in International's notes receivable account for Ownbey in the respective amounts of $11,248.13 and $60,000 reflect both the value and date of the transfer of International's interest in an oil royalty to Wynn, Inc., for payment of Ownbey's liability to Wynn, Inc. The total $71,248.13 value of the interest was offset against the credit balance of the account to reduce the balance due Ownbey to $3,104.55. Petitioner counters that the book entries in International's notes receivable account do not establish either transferee liability or the actual date of the transfer of the oil royalty. While we agree with petitioner's premise that a person does not become a transferee of assets merely because a book credit is made to his account, Whitney v. Commissioner,26 B.T.A. 212, 217 (1932), we note that its conclusion *54 is sound only if the book entry is not coupled with an actual transfer of assets. Petitioner does not challenge that here an oil royalty valued at $71,248.13 was in fact transferred to Wynn, Inc., for the benefit of Ownbey. As to petitioner's second point that the date of the book entry does not conclusively establish the precise date of the transfer, we agree. But proof is a matter of degree. The book entry is certainly credible evidence of the date of the transfer, and, in the absence of contrary evidence presented by petitioner, we find that respondent has satisfied his burden of proof on the date of the transfer. Similarly, respondent relies upon an adjusting entry for $15,609.65 on November 30, 1970, to International's notes receivable for Ownbey to establish the value and date of transfer of a sale of equipment to Ownbey. This transfer offsets all of International's liability to Ownbey in the notes receivable account. Petitioner again argues book entries do not establish actual date of transfers. Consistent with our discussion in the preceeding paragraph, we hold respondent has satisfied his burden of proof that the equipment was transferred on November 30, 1970. *55 Respondent asserts the last transfer was a direct cash payment by International to Ownbey's employees working on the Santone contract. From February 14, 1970, until the termination of the contract on March 4, 1970, International paid $27,657.83 in wages and employment taxes to these employees. Petitioner does not attack this point. Second, with regard to the element of fair consideration, respondent combines the transfers of the oil royalty, equipment, and cash in the amounts of $71,248.13, $15,609.65, and $27,657.83, respectively, to arrive at Ownbey's transferee liability of $41,045.92 by reducing those amounts for fair consideration. Thus, the balance of the assets transferred were not transferred for fair consideration. Although respondent's specific analysis on this point is somewhat technical and complex, the thrust of his argument is that Ownbey caused International to absorb $41,045.92 of Ownbey's losses on the Santone contract. Since the contract belonged to Ownbey, respondent argues International received no consideration in this amount. To arrive at $41,045.92 respondent first looks to International's notes receivable account for Ownbey. The balance of the account *56 on March 31, 1970, immediately prior to the transfers of the oil royalty, was $74,352.68 due Ownbey.Of this amount, $14,161.76 represented a loss on the Santone contract. Accordingly, of the $74,352.68 balance, $60,190.92 was valid consideration and $14,161.76 was not since the Santone contract was not International's contract. When the oil royalty of $71,248.13 was transferred on May 31 and June 30, 1970, the entire $60,190.92 fair consideration was consumed leaving $11,057.21 which was in turn offset against the $14,161.76 loss that was not fair consideration. A $3,104.55 balance due Ownbey remained in the account after the oil royalty transfer. This amount, which represented the remaining portion of the $14,161.76 loss on the Santone contract, was completely offset on International's account by the transfer of equipment for $15,609.65 on November 30, 1970. Therefore, the transfer of the oil royalty to the extent of $11,057.21 and the transfer of equipment to the extent of $3,104.55 were without fair consideration as provided by Tennessee law. The final transfer entering into the $41,045.92 figure was a direct cash payment by International to Ownbey's employees working on *57 the Santone contract. From February 14, 1970 to March 4, 1970, the termination of the Santone contract, International paid $27,657.83 in wages and employment taxes on Ownbey's employees working on the contract. This must be reduced by the net gain of $773.67 on the Santone contract for the period ending November 30, 1970, since this account represents fair consideration. Thus, International paid $26,884.16 of Ownbey's expenses during the period ending November 30, 1970. These three transfers total $41,045.92 as follows: Asset
Amount of transfer Transferred
without consideration
Oil royalty
$ 11,057.21
Equipment sale
3,104.55
Cash (wages and taxes)
26,884.16
$ 41,045.92
We agree with respondent's conclusions on this point. Certainly, paying someone else's expenses without receiving any benefit in return is a lack of fair consideration as defined in Tenn. Code Ann. sec. 64-311 (1976 Replacement). Moreover, Tenn. Code Ann. sec. 64-308 (1976 Replacement) defines a conveyance to include" * * * every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property * * *." The oil royalty, equipment, and payment *58 of wages and employment taxes were all transferred to or for the benefit of Ownbey thereby satisfying the Tennessee definition of conveyance. Finally, with regard to the element of insolvency, we must determine whether International was already or was rendered insolvent by the above transfers of $41,045.92 without fair consideration. Respondent first contends that, by including a $163,264.46 deficiency for its tax year ended November 30, 1968, International was insolvent for the entire period beginning December 1, 1969 to November 30, 1970, during which all three transfers in question were made. Alternatively, he asserts that if International's $72,771 refund is considered an asset as of December 1, 1969, the transfers rendered International insolvent. Petitioner contends that the $72,771 refund is indeed an asset as of December 1, 1969, and that although International was insolvent at November 30, 1970, that does not make it insolvent on the precise date of the transfers during the year ended November 30, 1970. The parties have stipulated the value of International's assets and liabilities, exclusive of the deficiency and tentative refund, which reveal excess assets of $104,555 *59 on November 30 and December 1, 1969, and of $2,172 on November 30, 1970. See, C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882, 899 (1970). We need now determine the effect of the November 30, 1968, deficiency of $163,264.46 and the tentative refund of $72,771.95.
The elements of respondent's deficiency in his notice of deficiency dated December 23, 1971, for International's tax year ended November 30, 1968, are as follows: Tax imposed
$ 330,969.50
Less: Amount shown on return
$ 240,476.99
Less rebate
( 72,771.95)
167,705.04
Deficiency
$ 163,264.46
This calculation complies with the statutory definition of a deficiency as found in section 6211 by treating the refund of $72,771.95 made on September 4, 1970, as a rebate as defined in section 6211(b)(2). We have previously held that, in determining the solvency of the transferor immediately after the transfer, the tax liability accruing at the end of the taxable year in wgich the transfer occurred as well as the tax liability for all prior years must be considered. Estate of Glass v. Commissioner,55 T.C. 543, 575 (1970), affd. per curriam 453 F. 2d 1375 (5th Cir. 1972). *60 Thus, the $163,264.46 deficiency must be considered a liability of International's on November 30, 1968, and therefore also on December 1, 1969, the beginning of the year of the transfers in question. Without considering the effect of the tax refund, International's liabilities would exceed its assets by $58,709.46 on December 1, 1969. If the refund of $72,771.95 is considered an asset on December 1, 1969, however, International's assets will exceed its liabilities by $14,062.49. Respondent contends that even though the refund increased the legal deficiency as a rebate under section 6211(a)(2), it cannot be considered an asset for the same period since it was disallowed in the notice of deficiency. He argues it did not legally exist. We think this argument goes to far. The net economic effect of the payment of the refund and its subsequent disallowance is that it never existed. If the refund had never been made, the deficiency would have been $72,771.95 less. We simply will not increase International's liabilities for a refund paid and not allow it a corresponding increase on the asset side.To do so ignores the economic reality of the transaction. Thus, we find that International's *61 assets exceeded its liabilities on December 1, 1969, by $14,062.49. As a result, it was solvent on that date within the meaning of Tenn. Code Ann. sec. 64-309 (1976 Replacement). Moreover, we think the refund must similarly be treated as an asset at November 30, 1970. As a result, we find that International's liabilities exceeded its assets by $88,320.51 on that date thereby making it insolvent at the end of the year. The mere fact that the transferor was insolvent at the end of the year does not establish that it was insolvent when transfers were made earlier in the year, nor does it establish that the making of such transfers caused it to become insolvent. Stokes v. Commissioner,22 T.C. 415, 429 (1954). Respondent argues, however, that if we find that International's assets exceeded its liabilities by $14,062.49 that the three transfers during the year ended November 30, 1970, rendered it insolvent.[3] According to this theory the transfers of $41,045.92 completely offset those excess assets. We agree in part. *62 When Ownbey purchased International's stock on October 29, 1969, all of International's government contracts had expired and they were never renewed. Wynn testified that International's large losses for its years ending November 30, 1969 and November 30, 1970, were the result of major losses in the retail clothing business and not the Santone contract. On the basis of the record before us, we do not think International was solvent after the transfers to Ownbey reduced its $14,062.49 excess asset balance on December 1, 1969, to zero. Accordingly, we find that International was rendered insolvent by the transfers of assets to Ownbey equal to $26,983.43, the balance resulting from subtracting $14,062.49 from $41,045.92. As a result, Ownbey is liable as a transferee under section 6901 in an amount equal to $26,983.43.
Having determined the existence of $26,983.43 of transferee liability, respondent next asserts that he is allowed 6 percent interest under Tennessee law from July 13, 1974, the date the notice of deficiency was sent to transferee Ownbey. In Estate of Stein v. Commissioner,37 T.C. 945, 959-960 (1962), we held that state law determines the existence *63 and extent of a transferee's interest liability from the time of transfer to the date notice of deficiency is sent to the transferee; and upon sending the notice of deficiency, respondent is entitled to interest thereon just as he is entitled on any deficiency. Since respondent does not argue for interest before the notice of deficiency was mailed to Ownbey, we find he is entitled to normal deficiency interest on $26,983.43 under section 6601. To reflect the foregoing, Decision will be entered Under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The Tennessee statutes cited are the same as those in effect on the dates of the asset transfers in this case.↩
3. Respondent also asserts another argument which we think is without merit. He relies upon the principle of corporate liquidations which occur over a period of time to suggest that he is required to show only the ultimate insolvency of the transferor at the conclusion of the liquidation and not at the moment of any particular transfer. This is based upon the theory that the distributions are one integrated transaction. See Borall Corp. v. Commissioner,167 F. 2d 865↩ (2d Cir. 1948), affg. a Memorandum Opinion of this Court.We do not think multiple transfers occurring under a contract with performance spanning many years is analogous to the integrated single distribution theory of a corporate liquidation.